**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 28 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RALPH PAYNE, SR.,

    Defendant - Appellant.

No. 02-6130
D.C. No. CR-01-139-L
(W. D. Oklahoma)

**ORDER AND JUDGMENT***

Before **EBEL**, **LUCERO** and **HARTZ**, Circuit Judges.

This direct criminal appeal requires us to assess, among other things, the extent to which communication between jurors and court security officers mandates a mistrial. A jury convicted Ralph Payne of two counts of bank fraud in violation of 18 U.S.C. § 1344(1) and one count of possession of counterfeit

---

* At the parties' request, the case is unanimously ordered submitted without oral argument pursuant to Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G). This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

securities in violation of 18 U.S.C. § 513(a). Payne appeals, arguing that (1) the district court erred in admitting incomplete bank signature cards; (2) there was insufficient evidence to sustain his conviction; and (3) the court erred in denying his motion for a mistrial when a court security officer told a juror that the men seated behind the defense counsel's table were deputy marshals. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

**I**

Count One of the superseding indictment alleged that Payne engaged in a scheme to defraud Bank One, located in Oklahoma City, Oklahoma. According to the federal grand jury, the purpose of this scheme was to inflate an existing bank account artificially with the deposit of a worthless check, thereby enabling the withdrawal of funds from the account before the worthless check was detected.

With regard to this count, the grand jury alleged that in October 1997, Eric S. Hawke opened a checking account at Bank One, for Hawke Productions, Inc., a corporation engaged in concert promotion. Payne was added as a signatory to the account on June 5, 1998. Hawke served as president of Hawke Productions, and Payne as vice-president.

On June 18, 1998, Hawke deposited a check into the Hawke Productions account at Bank One in the amount of $18,000, drawn on Payne's personal checking account. Payne had signed the check, but had not filled out the rest of

it.[1]  After this check was deposited, Hawke made out a check payable to "cash" in the amount of $13,500.  On June 23, 1998, the $18,000 check signed by Payne was returned to Bank One as drawn on insufficient funds.  That same day, deposits totaling $30,000 were made to the Hawke Productions account at Bank One, consisting of two checks drawn on the account of Misty Satterlee.  These checks were also returned as drawn on insufficient funds.  Subsequently, Bank One closed the Hawke Productions account.

Count Two of the indictment alleged that Payne engaged in a scheme to defraud Arvest United Bank.  Specifically, the grand jury alleged that the purpose of the scheme—similar to the first count—was to defraud the bank by depositing a counterfeit check drawn on the account of Hormel Foods Corporation and immediately withdrawing funds before the counterfeit check was detected.

As to this count, the grand jury asserted that Payne obtained a check in the amount of $34,785.45, drawn on the account of Hormel Foods Corporation and made payable to Erudite Entertainment, Inc.  On July 12, 2000, Payne and Karim Muhammad opened a checking account at Arvest United Bank for Erudite Entertainment, Inc., a corporation involved in promoting concerts.  Muhammad identified himself as the CEO of the corporation, and Payne identified himself as

---

[1]  When shown the $18,000 check by a special agent from the FBI, Payne admitted that it contained his signature but denied he wrote the name of the payee or the amount.

the president.  To open the account, they deposited the Hormel check.  Two days later, they returned to the bank and cashed a $10,000 check, payable to Muhammad, drawn on the Erudite account.  In the next few days, the pair returned to the bank two times to cash Erudite checks, payable to Muhammad, in the amounts of $18,000 and $6,000, respectively.  On each occasion, Muhammad cashed the checks and gave Payne the money.[2]

At some point, the branch manager of Arvest United became concerned about the size of the opening deposit check and also the checks presented to the bank thereafter.  Consequently, she contacted Hormel's bank and then a representative of Hormel; she learned that the $34,785.45 Hormel check was indeed counterfeit.  Hormel reviewed its records, discovered that the check with the number corresponding to the $34,785.45 check had been issued to its vendor M&M Supply, Inc. in the amount of $123.95, and confirmed Hormel did not have a vendor named Erudite Entertainment.

An FBI agent interviewed Payne about the Hormel check, and later testified that Payne told him he received the check from three individuals whose last names Payne did not know.  Payne also denied keeping any of the money withdrawn from the bank following the initial deposit; he claimed he returned the

---

[2]  On one occasion, however, Payne gave Muhammad $2,100 in cash.

money to the individuals who gave him the Hormel check in order to build trust for future business dealings in the entertainment industry.

A jury convicted Payne of both counts of bank fraud, and one count of possession of a counterfeit security (the Hormel check). Following the jury's verdict, a court security officer ("CSO") told the FBI (who in turn informed the government) that he had communicated with one juror during the trial. Notified of this, Payne filed a motion for a mistrial. The district court held a hearing to determine the extent and nature of the communication. At the hearing, the CSO testified that one juror had asked him about the identity of the men seated behind defense counsel's table, and he answered that the men were deputy marshals. Three additional jurors overheard this information or learned it from the other juror. Concluding that the communication did not affect Payne's right to a fair and impartial trial, the district court denied the motion for a mistrial. Payne was sentenced to seventeen months' imprisonment and five years' supervised release, and was ordered to pay restitution in the amount of $34,250. We consider Payne's direct appeal.

## II

As his first argument, Payne contends that the district court erred in admitting as evidence microfiche copies of the front side of bank signature cards. We review the district court's decision to admit evidence for an abuse of

discretion. <u>United States v. Samaniego</u>, 187 F.3d 1222, 1223 (10th Cir. 1999). We will reverse the district court's evidentiary ruling "only upon a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." <u>Id.</u> (quotation omitted). Federal Rule of Evidence 1002 provides, in pertinent part, that "[t]o prove the content of a writing . . . the original writing . . . is required, except as otherwise provided in these rules or by Act of Congress." Fed. R. Evid. 1002. Rule 1003, however, provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed. R. Evid. 1003.

In the instant case, Payne objected to the admission of three pieces of evidence: (1) a copy of a signature card for Hawke Productions, Inc. at Bank One; (2) a copy of a signature card for Erudite Entertainment, Inc. at Arvest United Bank; and (3) a copy of a signature card for Ralph Payne at Arvest United Bank. Noting that the copies did not reveal the reverse sides of the signature cards, Payne claimed that the reverse of the cards contained pertinent terms and conditions, and that the incomplete nature of the copies deprived him of the opportunity for complete cross-examination. Overruling Payne's objection, the

district court held that without further proof, it had no way to know if the reverse sides of the cards were relevant.

On appeal, Payne does not claim that there was a genuine question as to the authenticity of the original bank records. Although he makes a conclusory statement that admitting the duplicates "was unfair, and deprived him of complete cross-examination," Payne fails to explain why it was unfair or why his right to cross-examination was prejudiced by the admission of incomplete copies in lieu of the originals. (Appellant's Br. at 9.) Payne fails to show how the reverse side of the bank signature card is remotely relevant to his case. As the government points out, all pertinent information was located on the front side of the signature card: the date the account was opened, the name of the account, the type of account, the authorized signatories on the account, and the account number. It appears that the back of the signature card contained only additional terms of the deposit agreement that are irrelevant to the issue the cards were admitted to prove, namely that Payne was a signatory on the contested accounts. Thus, we conclude the district court did not abuse its discretion in admitting copies of the bank signature cards.

### III

Payne also asserts that there was insufficient evidence to support his conviction for two counts of bank fraud and one count of possession of

counterfeit securities. "We review the record for sufficiency of the evidence de novo." United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997). "Evidence is sufficient to support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government." Id. (quotation omitted). In our review, we do not weigh conflicting evidence or consider the credibility of witnesses. United States v. Sanders, 240 F.3d 1279, 1281 (10th Cir. 2001).

To obtain a conviction for bank fraud under 18 U.S.C. § 1344(1), the government must prove (1) that Payne knowingly executed or attempted to execute a scheme to defraud a financial institution, (2) with the intent to defraud, and (3) that the financial institution was insured by the Federal Deposit Insurance Corporation ("FDIC"). United States v. Rackley, 986 F.2d 1357, 1360–61 (10th Cir. 1993). In order to convict Payne of possession of a counterfeit security under 18 U.S.C. § 513(a), the government must prove (1) that Payne possessed a counterfeit security, (2) with the intent to deceive an organization, and (3) that the organization operates in or its activities affect interstate or foreign commerce. 18 U.S.C. § 513(a)–(c). In conclusory fashion, Payne contends that the evidence was insufficient to support his convictions under § 1344(1) and § 513(a), but does not identify what aspect of the evidence is insufficient.

As to Count One, the scheme to defraud Bank One, there was ample evidence before the jury that Payne engaged in a scheme to deposit a worthless check, thereby inflating an existing bank account and enabling the withdrawal of funds before the worthless check was returned. According to testimony at trial, Payne admitted to an FBI agent that he tendered a check for $18,000, payable to Hawke Productions, knowing that he did not have the funds to cover the check. After Eric Hawke, the president of Hawke Productions, deposited the check, he immediately withdrew $13,500 from the account. When the $18,000 check was returned to the bank, deposits totaling $30,000 were made to the Hawke Productions account, consisting of checks signed by Misty Saterlee. Evidence showed that Payne was aware that Saterlee provided worthless checks to Hawke in return for a fee. Although Payne asserts that there was no evidence that he ever transacted business on the Hawke Productions account, it is undisputed that he was a co-signer on the Hawke Productions account and the vice-president of Hawke Productions. Thus, the government provided sufficient evidence to establish a scheme to defraud.

With regard to the intent to defraud, Payne claims that he thought "the $18,000 check on his account . . . would not be deposited into the Hawke Productions account at Bank One until Eric Hawke gave [him] a corporate check from another account to cover the deposit . . . ." (Appellant's Br. at 12.) The

government explains, however, that there was also testimony that Payne knew Hawke would deposit the worthless check but thought Hawke would "use a corporate check from another account to buy time and to cover Payne's check." (Appellee's Br. at 19.) Thus, intent to defraud was established. Moreover, Payne does not dispute that Bank One was insured by FDIC. In reviewing the evidence in the light most favorable to the government, therefore, we conclude that the combination of various pieces of evidence—circumstantial and direct—is sufficient for a reasonable jury to find all the elements of 18 U.S.C. § 1344(1) with respect to Count One.

With respect to Count Two, the scheme to defraud Arvest United Bank, there was also ample evidence to allow a reasonable jury to convict Payne. Testimony at trial established that Payne received a counterfeit check in the amount of $34,785.45, drawn on the account of Hormel Foods Corporation. Along with Karim Muhammad, Payne opened an account at Arvest United with this check. Within the next few days, Payne and Muhammed returned to the bank and made three withdrawals, in the amounts of $10,000, $18,000, and $6,000. That it was Muhammed who actually withdrew the funds while Payne waited outside does not preclude a reasonable jury from concluding that Payne participated in a scheme with the intent to defraud Arvest United. In fact, when summoned by a bank teller to explain the large initial deposit, Payne lied and

stated it was in connection with the State of Oklahoma Food Services. Furthermore, after each withdrawal, Muhammed gave Payne the majority of the cash.

While Payne suggests that there was no evidence that he knew the Hormel check was counterfeit when he received it, a reasonable jury certainly could have concluded the contrary, particularly in light of the following facts: Payne told an FBI agent that he did not know the last names of the men who gave him the Hormel check, Erudite Entertainment did not provide Hormel with any services, and Payne lied to the teller regarding the source of the check. Accordingly, the evidence provides sufficient ground for a reasonable jury to find intent to defraud. Again, Payne does not contest that Arvest United was insured by FDIC. We conclude, therefore, that there was sufficient evidence to convict Payne of Count Two.

Finally, we conclude that there was sufficient evidence to sustain a conviction for the third charge, possession of a counterfeit security. Testimony established that the Hormel check actually bearing number 1182934 was payable to one if its vendors, M&M Supply, in the amount of $123.95. Payne deposited a check with this same number at Arvest United Bank, but it was made payable to Erudite Entertainment, in the amount of $34,785.45. It is thus undisputed that Payne deposited a counterfeit check. Moreover, because evidence established that

Payne had intent to defraud Arvest United, as discussed above, the intent element of 18 U.S.C. § 513(a) is likewise satisfied. As Payne does not dispute that Arvest United operates in interstate commerce, we conclude that there was sufficient evidence for a reasonable jury to convict Payne of Count Three.

**IV**

Payne's final argument on appeal is that the district court abused its discretion in denying his motion for a mistrial premised on a third-party communication with a juror. He argues that the extraneous contact between the court security officer ("CSO") and a juror, where the officer related the identity of deputy marshals in the courtroom, was so prejudicial that it denied him the right to a fair trial. Specifically, Payne contends that the officer's statement served to highlight for the jury the fact that he was surrounded by security personnel, and he asserts that "[j]urors naturally presume guilt and dangerousness from the fact that those in authority have determined that the defendant must be restrained or is incarcerated." (Appellant's Br. at 21.)

After the jury found Payne guilty on all charges, the government learned of the communication between the CSO and the juror, and notified defense counsel. Payne then filed a motion for a mistrial, and the district court held a hearing to determine the extent and nature of the communication. CSO Dave Williams testified that one of the jurors asked him about the identity of the men seated

behind defense counsel's table. Williams told the juror that the men were deputy marshals and the juror responded, "oh." (Appellant's Br. at 17.) This communication took place when the jury was returning to the courtroom following a break, while Williams was holding the door open for the jury. The juror confirmed Williams's testimony and also testified that he told a juror seated behind him what he learned from Williams. Two other jurors testified that they overheard the CSO identify the marshals, and three other jurors testified that they assumed the men in question were marshals.

In a criminal case, any private communication or contact with a juror during a trial about a matter pending before the jury is deemed presumptively prejudicial. Remmer v. United States, 347 U.S. 227, 229 (1954); United States v. Hornung, 848 F.2d 1040, 1044 (10th Cir. 1988). This presumption is rebuttable, even if the contact comes to the court's attention after the jury reaches its verdict, "but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Hornung, 848 F.2d at 1044 (quoting Remmer, 347 U.S. at 229). We have held that "[a] trial court has broad discretion in reviewing the effect of extrajudicial information." Id.

It is well-established that "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." Id. at 1045

(quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).  Upon learning that extrinsic information may have tainted the trial, the proper remedy is for the district court to hold a hearing to determine the circumstances and content of the contact, and to discern the prejudice, if any, to the defendant.  Id. at 1045.  The court is forbidden from inquiring about the subjective effect of the contact on the juror's deliberations; rather, it must utilize an objective standard in assessing the possibility of prejudice to the defendant.  Id.; see also Fed. R. Evid. 606(b) (providing that "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict").  In assessing the possibility of prejudice, the court should review "the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware."  Hornung, 848 F.2d at 1045.  We review a district court's denial of mistrial for abuse of discretion.  United States v. Begay, 144 F.3d 1336, 1339 (10th Cir. 1998).

In the instant case, the district court conducted a hearing to determine the nature of the contact and its possible prejudicial effect.  Utilizing the proper objective standard, the court acknowledged that the communication between CSO Williams and the juror is deemed presumptively prejudicial to Payne, but went on

to conclude that the government met its burden in establishing that the contact was harmless. Given the overwhelming evidence of Payne's guilt, "the extrinsic information regarding the bare identity of the deputy marshals was harmless." (1 R. Doc. 62 at 5–6.) After carefully reviewing the record, we agree with the district court that any prejudice to Payne's trial was harmless.

Payne attempts to analogize the present situation to one in which a defendant appears before the jury in handcuffs, shackles, or prison attire. See Estelle v. Williams, 425 U.S. 501, 504–05 (1976) (holding that a state cannot compel a defendant to stand trial in identifiable prison garb because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment"). Payne argues that the presence of known security guards (i.e., deputy marshals) "served as a constant reminder to [his] jury that he was in custody and needed to be continuously guarded" and inflamed his "dangerousness and guilt" in the eyes of the jury. (Appellant's Br. at 22 (quotation omitted).)

In our view, Estelle is not implicated in the instant case because there is no allegation that the government compelled Payne to appear in prison clothes during trial or in any attire related to his status as a prisoner. To the extent Payne argues that the presence of marshals in the courtroom prejudiced his trial because it suggested his guilt, the Supreme Court has held that "the conspicuous, or at least

noticeable, deployment of security personnel in a courtroom during trial" is not inherently prejudicial.  Holbrook v. Flynn, 475 U.S. 560, 568–69 (1986) ("While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable.").  There is not an "unacceptable risk of prejudice" inherent in jurors knowing of the presence of marshals in the courtroom, id. at 571, and Payne has presented us with nothing that would lead us to reach a different conclusion, such as an allegation that the marshals were heavily armed.  In any event, jurors will likely take the presence of armed guards for granted "so long as their numbers or weaponry do not suggest official concern or harm."  Id. at 569; see also United States v. Lampley, 127 F.3d 1231, 1237 (10th Cir. 1997) (holding that the presence of unarmed and plain-clothes security officers in the courtroom did not prejudice defendants' right to a fair trial).

In sum, we agree with the district court that, given the evidence of Payne's guilt, the extraneous communication was harmless and did not prejudice Payne's right to a fair trial.  Thus, the district court did not abuse its discretion in denying Payne's motion for a mistrial.

**IV**

For the foregoing reasons, we **AFFIRM** Payne's conviction.


ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge