# IN THE COURT OF APPEALS OF IOWA

No. 14-2058
Filed April 27, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DANIEL BRATCHER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Muscatine County, Thomas G. Reidel, Judge.

Defendant appeals his conviction and sentence for assault with intent to commit sexual abuse. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Rachel C. Regenold and Stephan J. Japuntich, Assistant Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., and Vogel and Potterfield, JJ.

2

**POTTERFIELD, Judge.**

Daniel Bratcher appeals his conviction and sentence for assault with intent to commit sexual abuse, an aggravated misdemeanor, in violation of Iowa Code section 709.11 (2013). Bratcher maintains the district court abused its discretion by allowing a uniformed jailer to accompany him into chambers each time a prospective juror was individually questioned because it suggested he was dangerous and deprived him of his right to a fair trial. Bratcher also maintains the district court abused its discretion when it excluded prior allegations of sexual abuse made by the complaining witness. Lastly, he argues the court abused its discretion when it denied his motion for new trial because the verdict is contrary to the weight of the evidence.

## I. Background Facts and Proceedings

On January 22, 2013, Bratcher was charged by trial information with sexual abuse in the third degree, a class "C" felony. Because he had been convicted of felonies at least twice before, the State also notified Bratcher that it intended to pursue the habitual offender sentencing enhancement, pursuant to Iowa Code section 902.8.

On June 13, 2014, Bratcher filed a motion to offer evidence of the complaining witness's prior claims of sexual abuse. Bratcher maintained the prior claims were false and therefore admissible. The State resisted. Before the commencement of Bratcher's jury trial, the court ruled "that the defendant has failed to prove that the statements are false by a preponderance of the evidence." The court denied Bratcher's motion, thereby excluding the evidence.

The jury trial took place on October 6–8, 2014. Prior to voir dire, Bratcher's attorney made the following statement to the court:

> [A]s the court knows, it uses questionnaires, and that involves leaving the Court and coming into chambers.
> Mr. Bratcher is—his rights to a fair trial—he's been in jail since January of 2013. He's allowed to be—he must be tried in his civilian clothes, not a jail uniform, no shackles or other restraints of any kind that would create a negative impression or an unfair impression on the jury.
> When we went from the courtroom,[1] which is 30 feet from chambers here, into chambers and back and forth talking to these jurors on an individual basis, the jailer always accompanied Mr. Bratcher. I'm not saying that [Bratcher] was cuffed. I'm not saying that they led him by the arm or anything else, but they followed pretty closely.
> I'm not aware that Mr. Bratcher has ever stated a threat to anybody. We're just asking—but, again, they sit right behind him in the courtroom, and I'm not going to raise an issue about that. It's just that it creates the impression to a juror that [Bratcher's]—he's so dangerous that a jailer must accompany him at all times.
> . . . .
> We're asking the jailer, and just in that back and forth from the courtroom to chambers, not accompany Mr. Bratcher. I understand that there may be some policy or policies in place from the Muscatine County Sheriff, but I think that Mr. Bratcher, in this fairly limited situation, his right to a fair trial, to avoid an appearance that unduly prejudices him, that they should not accompany him.

The State resisted Mr. Bratcher's request, arguing the jail staff was allowed to use reasonable measures to ensure the safety of the people within the courtroom and that it did not imply Mr. Bratcher was dangerous. The court ruled:

> I'm going to deny the request. I don't think there's any unfair prejudice from that. I think that most members of our community are already aware of the fact that there are usually, in criminal cases, some sort of uniformed law enforcement. If you watch any shows on TV, you're always going to see a bailiff who is usually in uniform.
> We actually don't have that all the time, but I don't think our jurors are aware that that wouldn't be the case. He's not shackled.

---

[1] Bratcher was previously tried for the same offense, and the first trial resulted in a mistrial when the jury was unable to come to a unanimous conclusion.

He's not in cuffs. I think that they'll think there's nothing out of the ordinary, that we have courthouse security that's present in the courthouse.

I don't think there's any prejudice that attaches to and from that, so I'm going to deny the request.

At trial, the complaining witness, Bobbi Jo, testified that on January 4, 2013, she and a friend had gone out to a few local bars. She was drinking at each bar and was generally having a good time dancing and talking to people. They stayed out until the bar closed, which she believed occurred at approximately 1:45 in the morning of January 5th. When the bar closed, the friend decided to go home, and Bobbi Jo decided to leave with other friends to go to their apartment. Bobbi Jo testified she had "quite a few drinks" throughout the night and did not believe she was sober enough to drive when the bar closed.

Bobbi Jo proceeded to Ashley and Pedro's apartment along with a few other people. By approximately 4 a.m., the party was winding down, and only Ashley, Pedro, Bobbi Jo, Brenda, and Bratcher remained in the apartment. Bobbi Jo estimated it was approximately 5 a.m. when she announced she was going to sleep and laid down on the couch to do so. When she lay down, she was wearing jeans that were "[f]ully on, buttoned, zipped." Bobbi Jo testified she was sleeping on her stomach when she woke up suddenly, feeling pressure in her vagina and anus. She was unable to stand up or kick her legs, and she started screaming. Brenda, who had been sleeping sitting up on the couch, got up and ran out of the room. Bobbi Jo testified that she saw Bratcher step back from behind her and into her line of vision and the pressure stopped. She realized it had been Bratcher's fingers in her vagina and anus. When Bobbi Jo stood up, she realized her pants and underwear were pulled down to her knees.

She pulled her pants up and attempted to zip them, but the zipper was broken. Bobbi Jo went to the local hospital a few hours later, and a rape kit and a "head-to-toe" examination were completed.

Dr. Katherine Hurst completed the examinations of Bobbi Jo at the hospital. She testified Bobbi Jo had reported to her that she was sexually assaulted at a party. Bobbi Jo reported she had woken up with someone's hand or fingers in her vagina. She did not mention her anus to the doctor. Dr. Hurst testified that she did not see any trauma to the body in either the pelvic exam or the head-to-toe exam. Dr. Hurst also testified that the lab results taken that morning indicated Bobbi Jo had alcohol and cocaine in her system, which corroborated what Bobbi Jo had told the doctor. Dr. Hurst testified there were no signs of trauma but due to the elasticity of vaginal tissue, there is not always evidence of injury after sexual assault.

Ashley and Pedro both testified at the trial as well. Each testified that Bobbi Jo and Brenda were both asleep on the couch in the living room when they went to bed in their room. Additionally, both testified that Bratcher was still awake in the apartment and was the only other person still there. Ashley testified she awoke to screaming coming from the living room; she woke Pedro up, and they entered the living room at the same time. Both testified that Bobbi Jo was standing by the couch with her pants "halfway" down when they entered the room. Ashley testified Bratcher was still in the apartment at that time, and Pedro testified Bratcher was standing in the living room when they entered.

On October 8, 2014, the jury found Bratcher guilty of the lesser included offense of assault with intent to commit sexual abuse, an aggravated misdemeanor, in violation of Iowa Code section 709.11.

On November 26, 2014, Bratcher was sentenced to a term of incarceration not to exceed two years. Bratcher appeals.

## II. Standard of Review

We review the district court's decision regarding court room security for an abuse of discretion. *See State v. Wilson*, 406 N.W.2d 442, 450 (Iowa 1987) ("[W]e find no abuse of discretion by the court in its decision to require the security measures it deemed appropriate under the circumstances.") On the other hand, Bratcher's claim implicates his constitutional right to due process and a fair trial; we review constitutional issues de novo. *See State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 517 (Iowa 2011) ("[W]hen a constitutional issue is presented, the evidence relevant to that issue is reviewed de novo."); *see also People v. Stevens*, 218 P.3d 272, 285 (Cal. 2009) (holding that trial court decisions regarding courtroom security are reviewed for an abuse of discretion, but the "reviewing court will inquire whether, based on the record below, the trial court reasonably balanced the need for heightened security against the constitutional rights afforded the defendant").[2]

We review the district court's evidentiary rulings for an abuse of discretion. *State v. Alberts*, 722 N.W.2d 402, 407 (Iowa 2006).

---

[2] Bratcher has not raised this issue under the Iowa Constitution and he does not argue for a different standard than that used by federal case law.

"On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence." *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003).

## III. Discussion

### A. Indicia of Innocence

Bratcher maintains the district court abused its discretion and prejudiced his right to a fair trial when it allowed a uniformed jailer to accompany him to and from chambers each time a prospective juror was privately questioned about their responses to the "supplemental juror questionnaire."[3]

Bratcher asserts the jailer acted as a "human shackle" and urges us to analyze his appeal using the framework from previous shackling cases. "A criminal defendant is presumed innocent until his guilt is established beyond a reasonable doubt. Thus, a defendant is entitled to the indicia of innocence in the presence of the jury." *Wilson*, 406 N.W.2d at 448. Shackling a defendant in front of a jury is inherently prejudicial. *Id.* at 449; *see also Holbrook v. Flynn*, 475 U.S. 560, 569 (1986) (discussing *Estelle v. Williams*, 425 U.S. 501, 505 (1976)). On rare occasions, the State may overcome the presumption by showing the necessity for the restraints. *Holbrook*, 475 U.S. at 568; *Wilson*, 406 N.W.2d at 449.

---

[3] We note that voir dire was not reported, and it is unclear from the record how many times the complained of conduct occurred. By our count, sixty-one prospective jurors filled out the supplemental questionnaire and twenty provided responses that the court may have decided warranted further discussion. It is unclear if each of the twenty people was taken back into chambers and whether the defendant was walked back and forth for each new prospective juror.

The State, however, asserts the jailer accompanying Bratcher back and forth from chambers was a more "benign" measure, which was not inherently prejudicial, and, as such, the burden falls on Bratcher "to show the incident prejudicially affected the jury or that his ability to present his defense was impaired." The State relies on the United States Supreme Court case, *Holbrook*, for its proposition. 475 U.S. at 562. In *Holbrook*, the Court considered whether "a criminal defendant was denied his constitutional right to a fair trial when, at his trial with five codefendants, the customary courtroom security force was supplemented by four uniformed state troopers sitting in the first row of the spectator's section." *Id.* The Court recognized "that certain practices [such as shackling] pose such a threat to the 'fairness of the factfinding process' that they must be subject to 'close judicial scrutiny.'" *Id.* at 568 (citing *Estelle*, 425 U.S. at 503–04). As such, the court first had to determine whether the uniformed officers sitting behind the defendant—the "conspicuous, or at least noticeable, deployment of security personal in a courtroom during trial"—was an inherently prejudicial practice. *Id..* The Court ultimately concluded the presence of the armed officers was not inherently prejudicial. *Id.* at 574 ("Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings."). Because the action was not inherently prejudicial, the defendant had the burden to show actual prejudice was suffered. *Id.* at 572.

We believe the present situation is more analogous to the armed guards sitting near the defendant in *Holbrook* than the line of "pure shackling" cases. In fact, even the authority Bratcher cited to support his argument regarding the

officer as a human shackle ultimately concluded the armed officer sitting near the defendant while he testified from the witness stand was not inherently prejudicial. *See Stevens*, 218 P.3d at 281 ("We conclude a deputy's presence at the witness stand during a defendant's testimony is not inherently prejudicial. As the United States Supreme Court observed over 20 years ago, jurors have become accustomed to seeing security officers in public places such as the courtroom, and there is a wide range of inferences they may draw from an officer's presence near a testifying defendant.").

Although the facts of the present case are different than those of *Holbrook* because the jailer accompanied Bratcher and the attorneys back and forth from chambers rather than sitting behind him in the audience, we are persuaded by the Supreme Court's reasoning therein.

> Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to march its resources against a defendant to punish him for allegedly criminal conduct.
> . . . .
> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the

presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Holbrook*, 475 U.S. at 567, 569.

Because we find that allowing the uniformed jailer to walk behind Bratcher while he walked to and from chambers is not inherently prejudicial, Bratcher has the burden of showing he suffered actual prejudice. *See id.* at 572. Here, the jury was instructed that Bratcher was "presumed innocent and not guilty. This presumption of innocence requires you to put aside all suspicion which might arise from the arrest, charge *or the present situation of the defendant.*" (Emphasis added.) We presume juries follow the court's instructions. *State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010).

Bratcher has not established he suffered actual prejudice to overcome that presumption, so his claim fails. *See Holbrook*, 475 U.S. at 572 ("[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.").

### B. Previous Allegations

Bratcher maintains the district court abused its discretion when it excluded evidence of prior false allegations of sexual abuse made by Bobbi Jo.

Iowa Rule of Evidence 5.412 is known as the "rape-shield law," and it provides, "[I]n a criminal case in which a person is accused of sexual abuse, reputation or opinion evidence of the past sexual behavior of an alleged victim of such sexual abuse is not admissible." The rule's purpose is "to protect the victim's privacy, encourage the reporting and prosecution of sex offenses, and prevent parties from delving into distracting, irrelevant matters." *State v. Alberts*,

722 N.W.2d 402, 409 (Iowa 2006). Prior false claims of sexual abuse are not protected by the rape-shield law. *State v. Baker*, 679 N.W.2d 7, 10 (Iowa 2004) ("Because a false allegation of sexual activity is not sexual behavior, such statements fall outside both the letter and the spirit of the rape-shield law."). A criminal defendant wishing to admit such claims "must first make a threshold showing to the trial judge outside the presence of the jury that (1) the complaining witness made the statements and (2) the statements are false, based on a preponderance of the evidence." *Alberts*, 722 N.W.2d at 409.

Bratcher filed a motion to offer evidence of Bobbi Jo's prior claim of sexual abuse along with the report of the incident from the local sheriff's department. Although his motion stated he would call the individual accused by Bobbi Jo, he declined to do so when given the opportunity. The sheriff department's report describes its investigation, which involved a claim of sexual abuse while Bobbi Jo and the male were asleep together on a couch. The report concludes with a referral to the county attorney. Bratcher maintains this was enough to establish the allegations were false by a preponderance of the evidence because the alleged perpetrator denied the incident occurred and the prosecutor never filed charges against him. The district court concluded:

> The Court had a chance to review both the motion—the complete attached report as well as the resistance, and the Court finds that based on the motion and the report, that the defendant has failed to prove that the statements are false by a preponderance of the evidence. The Court cannot draw that conclusion from the report itself.

We agree with the district court that Bratcher failed to meet his burden to establish the prior allegations were false. Bratcher assumes, and urges us to do

likewise, that the prosecutor did not file charges because they determined Bobbi Jo's allegations were false, but there is nothing in the record provided by Bratcher that supports the assumption. It is unclear why the prosecutor declined to prosecute. There is no evidence Bobbi Jo recanted her allegation.

Because Bratcher failed to establish that the prior allegation was false, the evidence was protected by the rape-shield law. The district court did not abuse its discretion by excluding the evidence.

### C. Weight of the Evidence

Bratcher maintains the district court abused its discretion when it denied his motion for new trial because the jury's verdict was contrary to the weight of the evidence.

"Trial courts have wide discretion in deciding motions for new trial. Nonetheless, . . . trial courts [should] exercise this discretion carefully and sparingly when deciding motions for new trial based on the ground that the verdict of conviction is contrary to the weight of the evidence." *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). "[W]hen the evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions thereon," the trial court "has no right to disturb the findings of the jury, although [its] own judgment might incline [it] the other way. In other words, the finding of the jury is to be upheld by [the trial court] as against any mere doubts of its correctness." *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003) (quoting *State v. Oasheim*, 353 N.W.2d 291, 294 (N.D. 1984)).

Bratcher maintains Bobbi Jo was not credible because she had been drinking and had used cocaine before the incident occurred. Additionally, he

points out that sometimes she described the incident as Bratcher "jamming" his fingers into her and other times she described the incident as feeling "pressure." He also focuses on the fact that she never told the doctor that Bratcher had put his fingers in her anus.

Bobbi Jo admitted that she had been drinking alcohol the night of the incident; she testified that she was too drunk to drive when the bar closed. She did not volunteer the information that she had used cocaine, but she did not deny the use, as Bratcher implies. At trial, the following exchange occurred during cross examination of Bobbi Jo:

> Q: Isn't it true that you also tested positive for cocaine? A: I was given that information a week later from my family doctor.
> Q: Nobody at the hospital that day told you that; is that what you're telling us? A: Exactly what I'm telling you, yes, sir.

Bratcher maintains Bobbi Jo's intoxicated states makes her testimony about the incident not credible. The jury heard the information regarding Bobbi Jo's state, and they were free to give her testimony the weight they believed it deserved. *See State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) ("The function of the jury is to weigh the evidence and 'place credibility where it belongs.'" (citation omitted)). Additionally, we do not find Bobbi Jo's various descriptions of the incident as contradictory. She did not change or recant her allegations; she consistently stated Bratcher used his fingers to penetrate her. Additionally, both Pedro and Ashley testified that they came out into the living room after hearing Bobbi Jo screaming and saw her with her pants and underwear around her knees. Both agreed that Bratcher was still in the apartment when they entered the living room.

"Except in the extraordinary case, where the evidence preponderates heavily against the verdict, trial courts should not lessen the jury's role as the primary trier of facts and invoke their power to grant a new trial." *Id.* This is not such a case, and the district court did not abuse its discretion in denying Bratcher's motion for new trial.

**IV. Conclusion**

The security measure Bratcher complains of was not inherently prejudicial, and he has not met his burden of proving he suffered actual prejudice. Additionally, the district court did not abuse its discretion in excluding evidence of a prior sexual abuse allegation because Bratcher did not establish the allegation was false based on a preponderance of the evidence. Lastly, the weight of the evidence was not contrary to the jury's verdict. We affirm.

**AFFIRMED.**