## HOLBROOK, SUPERINTENDENT, MASSACHUSETTS· CORRECTIONAL INSTITUTION, ET AL. *v.* FLYNN

No. 84–1606.   Argued January 14, 1986—Decided March 26, 1986

MARSHALL, J., delivered the opinion for a unanimous Court. BURGER, C. J., filed a concurring opinion, *post,* p. 572.

*Thomas More Dickinson,* Special Assistant Attorney General of Rhode Island, argued the cause for petitioners. With him on the brief were *Arlene Violet,* Attorney General, and *John Austin Murphy.*

*George Kannar* argued the cause for respondent. With him on the brief were *Charles S. Sims* and *Burt Neuborne.*\*

───────────

\**John K. Van de Kamp,* Attorney General, *Karl S. Mayer,* Assistant Attorney General, and *Robert E. Niver,* Deputy Attorney General, filed a brief for the State of California as *amicus curiae* urging reversal.

JUSTICE MARSHALL delivered the opinion of the Court.

The question presented in this case is whether a criminal defendant was denied his constitutional right to a fair trial when, at his trial with five codefendants, the customary courtroom security force was supplemented by four uniformed state troopers sitting in the first row of the spectators' section.

I

On August 14, 1975, nine masked men entered the Bonded Vault Co. in Providence, Rhode Island, robbed several employees at gunpoint, broke into most of the safe-deposit boxes in the vault, and escaped with approximately $4 million in cash and valuables. In January 1976, respondent and eight others were indicted in Providence County Superior Court for that crime. After a hearing in Superior Court, respondent and five of his alleged accomplices were ordered held without bail in the custody of the Warden of the State's Adult Correctional Institution.[1]

In April 1976, respondent and his five codefendants were brought to trial in Superior Court before Associate Justice Anthony A. Giannini. Upon entering the courtroom, respondent's counsel noted the presence of four uniformed state troopers, sitting in the first row of the spectators' section; the officers were not far behind, but were separated by the "bar" from, the seats assigned to the defendants for the duration of the trial.[2] Counsel immediately complained to the

---

[1] Of the remaining three defendants, two were fugitives at the time of respondent's trial, and the third appeared at that proceeding as a witness for the State.

[2] Although the record could have been clearer on this point, all the colloquies in the record corroborate the statement, made by respondent's counsel later in pretrial proceedings, that "sitting behind the defendants, taking the first row, vacating the first row where the spectators sit, are four uniformed state police guards, armed. . . ." Tr. 80; see *id.*, at 71–72. The troopers appear to have maintained this position throughout the course of the trial, although at times there might have been only three of them in the courtroom. See, *e. g.*, *id.*, at 109, 146.

judge that "the defendants would object to uniformed police, uniformed state police, sitting in the court as a display of 'strength' in the presence of the jury." Tr. 48–49. While counsel observed that he would have no objection to the use of any number of plainclothed security personnel, he argued that the presence of uniformed officers would suggest to the jury that defendants were of "bad character." *Id.*, at 48. Justice Giannini replied that the troopers were present because the Committing Squad, which usually supplied courtroom security personnel in such cases, was overextended at that time. Noting that he had not personally requested the assistance of the troopers, the judge agreed to see whether they might be made to wear civilian clothes for their future appearances in the courtroom.

The following week, Justice Giannini announced that he had "received a report that it is not practical, both from an organization point of view and also from a contractual point of view with the union representing the state troopers," for the four troopers to dress in civilian clothes. *Id.*, at 71. In the face of these constraints and in view of the need for adequate security, the justice ruled that the troopers could remain in the courtroom, in full uniform. He noted that because the troopers would be seated behind the bar, defendants would in no way be prejudiced. The next day, denying defendants' motion for reconsideration, Justice Giannini asserted that though he himself had not made the decision to deploy the troopers, he thought defendants "overly sensitive" to the danger of prejudice. *Id.*, at 84. At any rate, the justice went on, an examination of prospective jurors would reveal whether they were likely to draw adverse inference from the troopers' presence, and would thereby guarantee the rights of the defendants. Jury selection began.

In the meantime, respondent sought interlocutory review in the Rhode Island Supreme Court of Justice Giannini's ruling. After initially declining review, the Supreme Court read a transcript of the ruling and granted respondent's peti-

tion. Noting that "[t]he presence of armed, uniformed police officers acting as a security force in criminal courtrooms in this jurisdiction is a departure from the practice usually found in the trial courts. of this state," the court concluded: "The trial justice may not delegate responsibility that is his to the so-called security committee or its advisors. The presence of the State Police is a decision that must be resolved solely by the trial justice after consideration of all relevant factors." *State* v. *Byrnes*, 116 R. I. 925, 927, 357 A. 2d 448, 449 (1976).

Upon the State's request, Justice Giannini conducted a hearing at which the first witness was Captain Robert Melucci, the principal officer of the Committing Squad, the group charged with maintaining courtroom security during the trials of defendants in pretrial detention.[3] He testified that, because of other commitments in the courthouse, the force of 12 officers available for deployment in the building was insufficient to maintain the preferred ratio of 2 officers to every defendant in this six-defendant trial. Since any ratio approaching one-to-one posed a "security risk," Tr. 120, and he could spare only six officers for respondent's trial, Captain Melucci had contacted the Superior Court's presiding justice and informed him of the need for additional security personnel. As a result, Captain Melucci testified, additional help had been sought from the State Police.

The next witness, Major Lionel Benjamin, Executive Officer of the Rhode Island State Police, explained that any time his force was charged with transporting prisoners from the Adult Correctional Institution to the courthouse and maintaining custody during trial, he was contractually obligated to use officers from the uniformed division. That same contract with the Fraternal Order of Police, according to Major Benjamin, precluded him from asking members of the uni-

---

[3] The name of the Committing Squad has been changed to "Rhode Island state marshals." 1976 R. I. Pub. Laws, ch. 259, § 1 (codified at R. I. Gen. Laws § 42–56–3) (1984 reenactment).

formed division to perform their duties in civilian clothing. The Major went on to note that even were there no contractual bar, the force's plainclothes detective division lacked the personnel to provide security for the duration of respondent's trial. He concluded by saying that if the court required his troopers to wear civilian clothes, he would withdraw them. *Id.*, at 161.

After completing jury selection, Justice Giannini gave his final ruling on respondent's motion. He noted that "if these defendants were admitted to bail, there would be no state policemen and there would be no committing squad officers in this courtroom." *Id.*, at 229. But bail having been denied, it became the responsibility of the Warden and the Committing Squad to maintain custody of the detainees. The justice found that because the Committing Squad lacked the resources, the necessary level of security could be ensured only with the help of the uniformed troopers. Having held the presence of the troopers "justified by the evidence," Justice Giannini considered whether the presence of the troopers had prejudiced the defendants. He observed that of the 54 prospective jurors who had not been struck before they were asked about the troopers, 51 had responded that the troopers' presence "created no inference of guilt with regard to the defendants in their mind"; the remaining 3 had not precisely addressed the question. *Id.*, at 230–231. When asked to speculate why the troopers were present, many had given a vague response as to the need for security. In view of the *voir dire* responses, the justice concluded that the presence of the troopers would not affect defendants' ability to receive a fair trial.

The trial lasted more than two months and ended with verdicts acquitting three defendants and convicting respondent and two others. On appeal, the Rhode Island Supreme Court affirmed the convictions. *State* v. *Byrnes*, 433 A. 2d 658 (1981). With respect to respondent's objection to the troopers, the court concluded:

> "[T]he trial justice gave a reasoned and careful consideration of the issues raised by the presence of the uniformed troopers and, after consideration of all relevant factors, found that the presence of the troopers in no way prejudiced defendants. We have read the record, and we find no reason whatsoever to fault his conclusion." *Id.*, at 663.

Respondent then brought this habeas proceeding in Federal District Court. After certain procedural complications not relevant here, the District Court for the District of Rhode Island entertained the petition and rejected all the claims therein. With respect to respondent's objection to the presence of the troopers throughout the trial, the court held: "Less totalitarian alternatives appear to have been explored and rejected on rational grounds. The security measures approved here, extreme though they might have been, did not, under the totality of the circumstances, deny due process or equal protection to the petitioner." 581 F. Supp. 990, 998 (1984).

The Court of Appeals, however, reversed this dismissal. 749 F. 2d 961 (CA1 1984). Seizing upon the Rhode Island Supreme Court's observation that the presence of uniformed and armed troopers had been an "extraordinary" event, the Court of Appeals concluded that Justice Giannini had failed to consider whether the particular circumstances of respondent's trial had called for such measures.

> "Rather, with no threats shown to safety, he balanced nothing, but simply indicated a fear that since the defendants had not been bailed, they might flee from the courtroom. There was no evidence even suggesting any unusual likelihood of this; nor had anything whatever made 'manifest' the 'necessity for heightened security.' As for the exploration of less 'totalitarian alternatives,' the exploration was limited, notwithstanding defendants' suggestions, to inquiring whether regular commitment officers were available without inconveniencing the Pre-

siding Justice, and whether the union contract permitted the state police to appear out of uniform and unarmed." *Id.*, at 964.

Dismissing the trial judge's reliance on jurors' *voir dire* responses to rebut any suggestion of prejudice to respondent, the Court of Appeals asserted: "Even if all jurors had indicated an unreserved opinion that the troopers' presence would not affect them, such expression, on a case as extreme as this, where there was no need to rely on it, is totally unacceptable." *Id.*, at 965. The court ordered that the writ of habeas corpus be granted.

We granted certiorari, 472 U. S. 1026 (1985), and now reverse.

## II

### A

Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor* v. *Kentucky*, 436 U. S. 478, 485 (1978). This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge

assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

Our faith in the adversary system and in jurors' capacity to adhere to the trial judge's instructions has never been absolute, however. We have recognized that certain practices pose such a threat to the "fairness of the factfinding process" that they must be subjected to "close judicial scrutiny." *Estelle* v. *Williams*, 425 U. S. 501, 503–504 (1976). Thus, in *Estelle* v. *Williams*, we noted that where a defendant is forced to wear prison clothes when appearing before the jury, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.*, at 504–505. Since no "essential state policy" is served by compelling a defendant to dress in this manner, *id.*, at 505, this Court went no further and concluded that the practice is unconstitutional. This close scrutiny of inherently prejudicial practices has not always been fatal, however. In *Illinois* v. *Allen*, 397 U. S. 337 (1970), the Court emphasized that a defendant may be prejudiced if he appears before the jury bound and gagged. "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.*, at 344. Yet the Court nonetheless observed that in certain extreme situations, "binding and gagging might possibly be the fairest and most reasonable way to handle" a particularly obstreperous and disruptive defendant. *Ibid.*

## B

The first issue to be considered here is thus whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted

only where justified by an essential state interest specific to each trial. We do not believe that it is.

The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. See *Hardee* v. *Kuhlman*, 581 F. 2d 330, 332 (CA2 1978).

To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." *Kennedy* v. *Cardwell*, 487 F. 2d 101, 108 (CA6 1973), cert. denied, 416 U. S. 959 (1974). However, "reason, principle, and common human experience," *Williams, supra,* at 504, counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

## III

### A

The courtroom security force in this case consisted of four uniformed state troopers, two Deputy Sheriffs, and six Committing Squad officers. Though respondent does not concede that the deployment of the uniformed Committing Squad officers was proper, his focus at every stage of his habeas proceedings has been exclusively on the prejudice he attributes to the four state troopers. The only question we need answer is thus whether the presence of these four uniformed and armed officers was so inherently prejudicial that respondent was thereby denied his constitutional right to a fair trial.

The Court of Appeals was correct to find that Justice Giannini's assessment of jurors' states of mind cannot be dispositive here. If "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process," *Estes* v. *Texas*, 381 U. S. 532, 542–543 (1965), little stock need be placed in jurors' claims to the contrary. See *Sheppard* v. *Maxwell*, 384 U. S. 333, 351–352 (1966); *Irvin* v. *Dowd*, 366 U. S. 717, 728 (1961). Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused. This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial. Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play," *Williams*, 425 U. S., at 505.

We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of

receiving a fair trial. See ABA Standards for Criminal Justice 15–3.1(c) (2d ed. 1980). But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section.[4] Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the the four troopers tended to brand respondent in their eyes "with an unmistakable mark of guilt." *Williams, supra,* at 518 (BRENNAN, J., dissenting). Cf. *Dorman* v. *United States,* 140 U. S. App. D. C. 313, 327, 435 F. 2d 385, 397 (1970) (greater danger of prejudice if jury aware that arrangements are extraordinary). Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings. Indeed, any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants.

We note, moreover, that even were we able to discern a slight degree of prejudice attributable to the troopers' presence at respondent's trial, sufficient cause for this level of security could be found in the State's need to maintain custody over defendants who had been denied bail after an individualized determination that their presence at trial could not otherwise be ensured. Unlike a policy requiring detained defendants to wear prison garb, the deployment of troopers

---

[4] The only social science study to which respondent has pointed us addresses the effects of prison clothes and courtroom guards upon jury verdicts. Its tentative conclusion is that defendants clad in prison garb or accompanied by guards are more likely to be found guilty than unsupervised defendants wearing their own clothes. However, the study also found that favored treatment was accorded defendants who had *both* supervision *and* prison clothing. Fontaine & Kiger, The Effects of Defendant Dress and Supervision on Judgments of Simulated Jurors: An Exploratory Study, 2 Law and Human Behavior 63, 69–70 (1978). In view of these curious and concededly tentative results, we will, at least for now, rely on our own experience and common sense.

was intimately related to the State's legitimate interest in maintaining custody during the proceedings and thus did not offend the Equal Protection Clause by arbitrarily discriminating against those unable to post bail or to whom bail had been denied. See *Williams, supra,* at 505–506.

## B

The Court of Appeals rejected as wholly inadequate the reasons advanced by state authorities and accepted by Justice Giannini to explain why the four uniformed troopers had to be present at respondent's trial. However, our task here is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. While, in our supervisory capacity, we might express a preference that officers providing courtroom security in federal courts not be easily identifiable by jurors as guards,[5] we are much more constrained when reviewing a constitutional challenge to a state-court proceeding. All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over. Respondent has failed to carry his burden here.

The judgment of the Court of Appeals is

*Reversed.*

CHIEF JUSTICE BURGER, concurring.

I write only to explain my reading of the Court's statement that "in our supervisory capacity, we *might* express a prefer-

---

[5] See, *e. g., United States* v. *Jackson,* 549 F. 2d 517, 526–527 (CA8), cert. denied *sub nom. Muhammed* v. *United States,* 430 U. S. 985 (1977); *United States* v. *Clardy,* 540 F. 2d 439, 442–443 (CA9), cert. denied, 429 U. S. 963 (1976); *Kennedy* v. *Cardwell,* 487 F. 2d 101, 109 (CA6 1973), cert. denied, 416 U. S. 959 (1974). See also N. Dorsen & L. Friedman, Disorder in the Court 249 (1973).

ence that officers providing courtroom security in federal courts not be easily identifiable by jurors as guards . . . ." *Ante*, at 572 (emphasis added). In joining the opinion, I interpret the Court's carefully qualified statement in this case—a state case—as containing no suggestion that federal officers providing security must doff their uniforms before entering federal courtrooms, and certainly none of the three cases the Court cites, *ante*, at 572, n. 5, would require any such arbitrary action. Moreover, the issue of what kind of security arrangements some might "prefer" is, of course, quite distinct from issues such as whether a federal defendant would become entitled to a new trial because of an alleged prejudicial effect of the security measures used at his trial. On this understanding, I join the Court's opinion.