William Robert RIGDON, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

2015-SC-000689-MR

Supreme Court of Kentucky.

APRIL 27, 2017

Rehearing Denied August 24, 2017

COUNSEL FOR APPELLANT: Julia Karol Pearson, Department of Public Advocacy, Frankfort.

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Leilani K. M. Martin, Assistant Attorney General.

## OPINION OF THE COURT BY JUSTICE KELLER

A jury in Warren County[1] convicted Robert Rigdon of murder. Consistent with the jury's sentencing recommendations, the trial court fixed his sentence at confinement for thirty-eight years.

Rigdon now appeals as a matter of right, Kentucky Constitution § 110(2)(b), arguing that the trial court erred by: (1) ordering increased security during trial; (2) admitting testimony regarding the culture of the Iron Horsemen; (3) permitting alleged-*ex parte* communication between the Commonwealth and the trial court; and (4) overruling Rigdon's motions for a mistrial. For the reasons set forth below, we affirm.

## I. BACKGROUND

On the night of September 26, 2012, Gleason Pyles was working at the Tarter Gate Company in Dunnville, Kentucky. Pyles and Sam Trulock were the only employees working that night, and the two spoke briefly before parting ways. Shortly thereafter, Trulock was filling up paint in a location away from Pyles when he heard gunshots. Trulock returned to where he had previously spoken with Pyles and

found Pyles's body lying on the ground, with gunshot-related injuries to his head. Pyles suffered six gunshot wounds to his head and torso. DNA evidence found on cigarettes at the scene matched Rigdon's DNA.

Pyles had been a member of the Iron Horsemen motorcycle club and had recently left the group on bad terms with the local chapter's president, David Salyers.[2] There was testimony that Pyles was also indebted to Salyers for a motorcycle Salyers loaned him. Rigdon had just recently become a "fully-patched" member of the Iron Horsemen.

A Warren County jury convicted Rigdon of murder, and the trial court sentenced him to the recommended thirty-eight years' imprisonment. This appeal followed. We set forth additional facts as necessary below.

## II. STANDARD OF REVIEW

Because the issues presented require us to apply different standards of review, we set forth the appropriate standard as necessary when addressing each issue.

## III. ANALYSIS

**A. The trial court did not err in permitting extra security in the courtroom.**

Prior to the start of Rigdon's trial, the trial court was contacted by the Kentucky State Police (KSP). The KSP recommended that it provide additional security for Rigdon's trial based on unidentified threats it had received; and the trial court

---

1. Following transfer from Casey County to Warren County, and by Order of the Warren Circuit Court, Judge Judy Vance presided as Special Judge until final determination of the matter.

2. David Salyers was convicted of complicity to Pyles's murder. That conviction was affirmed by this Court in an unpublished Opinion, *Salyers v. Commonwealth*, 2014-SC-000133-MR, 2015 WL 4984552 (August 20, 2015).

ultimately agreed to the KSP providing that security.

■ A trial court's security measures are reviewed for an abuse of discretion. *Hill v. Commonwealth*, 125 S.W.3d 221, 236 (Ky. 2004). An abuse of discretion exists where the trial court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

■ Rigdon objected to what he contended was an "unusual level of police presence in and around the courthouse." The trial court overruled that objection, citing numerous factors on which it based its decision: the recommendation by the KSP to have additional security for the trial; the fact that a person with a knife had entered the courtroom during the trial of Rigdon's accomplice; and the fact that the house of a key witness against Rigdon had been burned down just prior to trial, requiring that witness's relocation and 24-hour protection.

The court ordered that the number of uniformed officers in the courtroom would be limited to four, and that every person, upon entering the courtroom, would be subject to having their person and property searched and scanned with a metal detector. At trial, only one uniformed officer and a bailiff were present inside the courtroom and, although there were additional KSP officers in the courtroom, they wore normal court attire that varied from officer to officer. Based on the information the trial court had before it, we discern no abuse of discretion.

During trial, Rigdon requested that the trial judge recuse herself. His motion for recusal was based on "numerous uniformed KSP officers" in the parking lots, the rotunda of the courthouse, and the hallway leading to the courthouse eleva-

tors; metal detectors in the courthouse rotunda and outside the courtroom doors; four to five Administrative Office of Courts personnel "wanding" each person as they entered the courtroom; bomb-sniffing K9 units inspecting the perimeter of the courthouse; five to six suited KSP Special Response Team members in the courtroom; and the "use of aircraft" to transport Rigdon from Fayette County to Warren County. Defense counsel asserted that,

[i]t has become increasingly clear to defense counsel that their client cannot and will not receive a fair and impartial trial in this case ... due to the massive and ridiculous security measures employed in this case. Judge Vance has become paranoid regarding the dangerousness of this case, simply because it involves the Iron Horsemen Motorcycle Club....

. . .

Clearly Judge Vance has been influenced by the fact that this case involves ... members of the Iron Horsemen Motorcycle Club. She has clearly become frightened of it and this unsupported fear has influenced her ability to handle this case in a fair and impartial manner and by her irrational belief that the jury has not been tainted by the extreme surety [sic] measures. Counsel believes that Judge Vance lacks the experience or desire to ensure that the Defendant [ ] receive a fair and impartial trial given his affiliation with the Iron Horsemen Motorcycle Club and must now recuse herself. To do otherwise would irreparably violate the Constitutional rights of the Defendant herein.

Rigdon continues this same argument on appeal, contending that he was denied his right to a fair trial and the presumption of innocence under the United States and Kentucky Constitutions. We disagree.

Before we begin our analysis of this issue, we note that defense counsel's behavior throughout this trial was disrespectful, if not contemptuous. Arguing that a trial court is "paranoid," its decisions "ridiculous," or that any judge in this Commonwealth "lacks the experience" to sit on a matter before the court is unacceptable. Judge Vance exercised extraordinary forbearance in not holding counsel in contempt, and we commend her for her patience and professionalism in the face of counsel's numerous and inappropriate statements.

■ Rigdon directs this Court to authority from other jurisdictions to support his argument that the additional security in the Warren County courthouse unduly prejudiced him. However, we find none of these opinions persuasive. We do find persuasive the United States Supreme Court's decision in *Holbrook v. Flynn.* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). There, four uniformed state troopers sat in the front row of the spectator section, behind the five codefendants on trial. The Supreme Court held that the troopers' presence was not inherently prejudicial:

> Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.

*Id.* at 567, 106 S.Ct. 1340.

> While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of guards.

*Id.* at 569, 106 S.Ct. 1340.

The Court conceded that conditions of security could exist which "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." *Id.* (internal citation omitted). However, we do not hesitate in stating that is not the situation here. As noted above, *Holbrook* concerned four uniformed officers. In the present matter, the courtroom contained only one uniformed officer and a bailiff. Furthermore, our holding is consistent with our precedent in *Soto v. Commonwealth*, in which we held that the presence of three uniformed officers and one plain-clothed officer was not excessive and did not "deprive [Soto] of the presumption of innocence." 139 S.W.3d 827, 876 (Ky. 2004). For the preceding reasons, we hold that the presence of additional security inside the courtroom was not prejudicial to Rigdon.

■ We are equally unpersuaded by Rigdon's arguments regarding security outside the courtroom. Rigdon cites to no authority to support his contention that outside security unduly prejudiced him, and we discern no distinguishing factor when viewed through the lens of *Holbrook.* Even assuming the jury was aware of guards in the rotunda or bomb-sniffing dogs, these precautions do not necessarily lead to the inference that the defendant, himself, is dangerous or guilty of the crime for which he is being tried.

**B. The trial court did not err by admitting testimony regarding the Iron Horsemen culture.**

Alcohol, Tobacco, Firearms and Explosive Agent Douglas Robinson, who had

investigated the Frankfort chapter of the Iron Horsemen motorcycle club, testified about the club's culture. Rigdon argues that the Court erred by admitting Robinson's testimony.

Rigdon argues on appeal that Robinson's testimony was irrelevant under Kentucky Rules of Evidence (KRE) 401 and 402. "Evidence which is not relevant is not admissible." KRE 402. Evidence is relevant only if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401.

In *Salyers v. Commonwealth*, we affirmed the conviction of Rigdon's accomplice to the subject-murder, and addressed this same relevancy argument regarding the same testimony by Agent Robinson:

Appellant, Bobby Rigdon, Dereck Salyers, and Gleason Pyles, all of the persons most directly connected with Pyles' death, were members of the Iron Horsemen. Pyles "turned in his colors" after a dispute with Appellant, the acknowledged leader of the group. Robinson's testimony provided the jury with information about the procedures for joining the Iron Horsemen, the symbolism of their club patches and insignia, the consequences for being disrespectful of the club, and most importantly, the consequences of leaving the club in bad standing. [T]his evidence assisted the jury by enabling it to better understand the context in which the individuals in this case interacted with each other. It therefore follows that, knowing the customs and mores of the Iron Horsemen makes it more likely that Appellant acted toward Pyles in a manner consistent with those mores. The testimony was clearly not irrelevant.

*Salyers*, 2014-SC-000133-MR, 2015 WL 4984552, at *7 (August 20, 2015). We see no reason to deviate from that cogent analysis and hold that Agent Robinson's testimony was relevant.

Rigdon also argues that Robinson's testimony was unduly prejudicial, and admitted in violation of KRE 403. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." This same argument was addressed in *Salyers*:

Of course, Robinson's testimony was prejudicial in the sense that it was detrimental to Appellant's case, but the prejudice it brought into the case against Appellant cannot be regarded as undue. For better or worse, Appellant cannot evade his voluntary participation in a group whose identity was a central theme of the case. Whatever stigma or honor that might attach as a result of that participation is simply part of the landscape upon which his case must be defended.

*Id.* at *8.

Again, we see no reason to deviate from the preceding analysis and hold that Robinson's testimony was relevant and not unduly prejudicial.

## C. The Commonwealth's communication with the trial court was improper. However, we discern no prejudice to Rigdon.

Rigdon's next argument concerns an email sent by one of the Commonwealth's Attorneys. On March 17, 2015, a hearing was held regarding the admissibility of Agent Robinson's testimony. One week later, on March 23, 2015, the Commonwealth sent the following email to the trial court's

judicial secretary, and copied Rigdon's counsel:

> Good morning. I have been doing a great deal of thinking about our hearing from last Monday regarding the culture of the Iron Horseman, [sic] I sincerely hope that I am not speaking out of turn and that I am not doing anything improper.....however, I have talked with some of our appellate attorneys and if the Court is inclined to rule differently in this case then [sic] in the Salyers case regarding this issue, we fear that it is creating implications with Salyers['s] appeal.... Especially an 11.42 or 60.02 motion. I am not trying to be backhanded and influence the Court on how to rule on this issue, however, if the Court is considering ruling inconsistent with the ruling in Salyers['s] case, we will have an unnecessary issue on our hands with regard to Salyers['s] conviction.... Some thoughts, if the Court is considering not allowing Agent Robinson to testify, the order needs to [be] very clear and state specifically how this case is different than Salyers['s] case where the Court allowed the same testimony. Or........ let the Commonwealth withdraw the motion to introduce that evidence so that the record is not inconsistent.

(Emphasis in original).

On May 12, 2015, Rigdon filed a motion to recuse the office of the Attorney General, arguing that the Commonwealth's email contained arguments regarding substantive issues and constituted an *ex parte* communication, in violation of the Rules of the Supreme Court (SCR). On May 14, 2015, the Commonwealth filed a response, noting that without objection, the parties had sent numerous emails to the court; opposing counsel had been copied on each email; and several of the emails had raised substantive issues. Furthermore, the Commonwealth argued that Rigdon had received the subject-email; therefore, it was, by definition, not *ex parte*. The court noted that it had not read the subject-email. The trial court overruled Rigdon's motion to exclude Agent Robinson's testimony, as well as his motion to recuse the office of the Attorney General.[3]

■ It appears that this issue is one of first impression in Kentucky. We are asked to determine whether an email pertaining to the merits of the case that is sent to a judge with a copy to opposing counsel constitutes improper *ex parte* communication. "*Ex parte*" is defined as: "Done or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested...." *Black's Law Dictionary* 296 (8th Ed. 2004). Thus, the primary factors in determining whether the Commonwealth's email to the trial court was an *ex parte* communication are whether Rigdon was given notice of the communication and whether he had an opportunity to respond. It is undisputed that Rigdon had both notice and an opportunity to respond. Therefore, the Commonwealth's email was not an *ex parte* communication. However, that does not end our analysis as we must determine whether this practice of communicating with the court via electronic communication,[4] even if it is not technically *ex parte* communication, is acceptable under our ethical rules or is otherwise improper.

---

3. We note that Rigdon filed numerous other motions relating to the admissibility of Agent Robinson's testimony, each of which was overruled.

4. "Electronic communication" encompasses all forms of electronic communication, including email, text message, and social media message.

SCR 3.130(3.5) states, in pertinent part, that "[a] lawyer shall not: (a) seek to influence a judge, juror, prospective juror or other official by means·prohibited by law; (b) communicate *ex parte* with such a person as to the merits of the cause except as permitted by law or court order." Although the use of email and other methods of electronic communication is arguably not contemplated by SCR 3.130(3.5), there is no doubt that electronic messaging pertaining strictly to administrative matters is convenient for the court and the parties. We discern no particular harm in communicating electronically regarding such matters as long as the parties and the court agree.

■ However, as we stated in *Sanborn v. Commonwealth*, "[E]very order requested of the court is a matter to be addressed in the presence of opposing counsel. It is a 'dangerous procedure' and a 'gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear· of the court.'" 754 S.W.2d 534, 549 (Ky. 1988) (quoting *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969)) (emphasis omitted). Electronic communications regarding substantive matters—especially in the interim between a hearing and the court's· ruling, as occurred here—at a minimum give the appearance of the impropriety we warned against in *Sanborn*.

■ Furthermore, such communications violate the spirit, if not the letter, of SCR 3.130(3.5), which is meant to ensure that parties discuss substantive matters with the court "in the presence of· opposing counsel." *Id.* Therefore, we discourage, in the strongest terms possible, communicating about substantive matters with the court via electronic communication.

■ Communicating with the court via electronic communication can create significant issues with regard to the administration of justice. Here, it appears that the parties and the court had come to at least an informal agreement that communication via email was acceptable. However, we discourage such informal agreements because they can lead to the very issue with which we are now presented. This results in unjustifiable delay and expense. Therefore, to the extent a judge and parties wish to communicate electronically, the judge should set forth in an entered order the extent to which such communication is permissible.

■ Finally, we note that there are additional perils with this form of communication. When examining an issue on appeal, it is to the benefit of the appellate courts and the parties that the record be complete. Electronic communications are certainly more easily lost, stolen, or strayed than written communications made through the usual course, *i.e.*, a document filed with the clerk of court. It is for that reason, if for no other, that Kentucky Rule of Criminal Procedure (RCr) 1.08(2)(d)(i) states that "[a]ll papers required to be served upon a party shall be filed with the court either. before service or within a reasonable time thereafter." [5] Despite RCr

---

5. This same rationale is evidenced in our Rules of Civil Procedure (CR). *See, e.g.,* CR 5.02(2) ("An attorney or party may elect to effectuate and receive service via electronic means to and from all other attorneys or parties in the action by filing a notice of such election with the clerk and serving a copy of such election by personal delivery or by mail as provided in [CR 5.02](1)."); CR 5.03 ("Proof of electronic service must state the electronic notification address of the person served and that the document was served electronically."); and CR 26.01(2) ("[When propounding or responding to discovery requests] transmitted by electronic mail, the document must be accompanied by electronic memorandum providing [CR 26.01(2)'s] identifying information.").

1.08(2)(d)(i)'s requirement, RCr 1.08(2)(d)(ii) provides that a judge may permit papers to be filed directly with him or her; [6] however, doing so puts the onus on the judge to note the filing date on any such papers and to forward the papers to the clerk. Certainly, a judge is free to undertake that responsibility, but the parties put the judge in that position at their potential peril and should not do so pursuant to an informal or tacit agreement.

For the preceding reasons, an electronic communication between the parties and the court must contain verifiable assurances that it was sent and received, and have the ability to be printed for filing with the clerk. While email is an acceptable form of communication under these requirements, this is not true of all electronic communications. To the extent other methods of electronic communications do not meet this requirement, they are unacceptable and should not be used.

Turning to the instant matter, we must determine whether this particular email sufficiently prejudiced Rigdon to merit a reversal of his conviction. The Commonwealth argues that the parties regularly communicated with the court via email and attached a number of examples. The exemplar emails provided by the Commonwealth related primarily to procedural matters: the logistics of changing venue; trial scheduling; and a substitution of counsel for the Commonwealth. They did not relate to a substantive issue and do not evidence an agreement that the parties could communicate electronically with the court on all matters. Nonetheless, this particular email was harmless because the trial court stated it had not read the email.

Therefore, we discern no prejudice to Rigdon.

## D. The trial court did not abuse its discretion by overruling Rigdon's motion for a mistrial.

Rigdon argued that the trial court erred by overruling two of his motions for a mistrial. A trial court's decision to deny a motion for a mistrial is reviewed for an abuse of discretion. *Mayo v. Commonwealth*, 322 S.W.3d 41, 51 (Ky. 2010). An abuse of discretion exists where the trial court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *English*, 993 S.W.2d at 945. "The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way." *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky. 2004) (citing *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996)).

### 1. The intimidated jury

During the trial, the Commonwealth reported to the court that several jurors had stated that they were uncomfortable because Rigdon's identical twin brother had been in the parking lot watching the jurors depart from the courthouse. At least one juror also stated that it looked like Rigdon's brother was writing down the license plate numbers of the jurors' vehicles. The judge stated that she had been advised of this issue two days earlier and had arranged for alternative transportation for the jurors to and from the courthouse. Rigdon's counsel, believing the jury had been tainted, moved for a mistrial.

Subsequently, the trial court *voir dired* each juror, asking them if they could give

---

**6.** RCr 1.08(2)(d)(ii) provides: "The filing of papers with the court as required by these Rules shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with him or her, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk."

Rigdon a fair trial. Each responded in the affirmative. Here, there was no evidence presented that the jurors were not able to do so; therefore, we hold that the trial court acted within its discretion to deny Rigdon's motion for a mistrial.

**2. Allegations that four jurors and the judge slept during trial**

 During its case-in-chief, the Commonwealth played video of Rigdon's interview with police. After the video had been played, defense counsel advised the court that she observed four of the jurors sleeping during part of the video and moved for a mistrial. Neither the Commonwealth nor the judge confirmed counsel's observation. The judge asked counsel which jurors were allegedly sleeping, stating that she would *voir dire* those jurors. During that *voir dire*, the jurors all denied sleeping. The court then denied Rigdon's motion for mistrial.

After the court made that ruling, one of Rigdon's attorneys stated that she also observed the judge sleeping. The Commonwealth did not confirm that observation, and the judge stated that she had not been sleeping. However, the judge advised counsel that if she thought otherwise, she should file an affidavit stating as much. Counsel did not file an affidavit.

 When a party believes it has been prejudiced because a juror or jurors fell asleep during trial, it "must present *some* evidence that the juror was actually asleep or that some prejudice resulted from that fact." *Ratliff v. Commonwealth*, 194 S.W.3d 258, 276 (Ky. 2006) (emphasis in original). We believe that the same evidentiary standard applies when a party alleges that a judge slept. The only "evidence" Rigdon presented that the jurors and the judge slept was counsel's unsworn allegation. As the aggrieved party, it was incumbent on Rigdon to present some evidence, not just an unsworn allegation that the jurors and the judge slept. Without other evidence, this Court will not find the trial court abused its discretion in denying Rigdon's motion for a mistrial.

 Finally, we believe it is incumbent on an aggrieved party who asserts that they observe a juror or the judge sleeping to call it to the court's attention at the time it occurs rather than at some later point in time. *See Shrout v. Commonwealth*, 226 Ky. 660, 11 S.W.2d 726, 727 (1928) ("The appellant could not sit by and see the juror sleeping, without asking the court to arouse him from his slumbers, and then complain about it after the trial was over.") Although it was not necessary to address the timing of counsel's motion herein, we caution the bar that a delay in raising the issue with the court could be fatal to any appeal of the issue.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Warren Circuit Court in this matter is affirmed.

All sitting. All concur.

