RENDERED:  DECEMBER 18, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0178-MR

VEGAS L. JACKSON                                                                APPELLANT

v.          APPEAL FROM FAYETTE CIRCUIT COURT
            HONORABLE ERNESTO SCORSONE, JUDGE
            ACTION NO. 16-CR-01139

COMMONWEALTH OF KENTUCKY                                                APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; K. THOMPSON AND L. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Vegas L. Jackson directly appeals from his conviction and sentence by the Fayette Circuit Court after a jury trial on the basis that he should not have been forced to represent himself and also raises claims of trial error.

Police found Jackson in the area of a "shots fired" 911 call. They identified him as a convicted felon and observed a gun sticking out of his pocket. Jackson was arrested, made statements about being attacked by an Arab man and a skinny white man, and denied being injured. Later, police noted Jackson had a wound on his hip and took him to a hospital. While at the hospital, a detective interrogated him and told him he believed the gunshot wound was self-inflicted. Jackson admitted to shooting himself.

In December 2016, Jackson was indicted for being a convicted felon in possession of a handgun, carrying a concealed deadly weapon, and being a first-degree persistent felony offender (PFO-1). As Jackson was indigent, the Department of Public Advocacy (DPA) was appointed to represent him.

In June 2017, Jackson asked to represent himself and his counsel requested a *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), hearing. Jackson was permitted to represent himself with standby counsel. A few months later, Jackson was permitted to withdraw his motion to represent himself in favor of having counsel. After not appearing for his trial, Jackson indicated he could not get along with counsel and preferred representing himself to being represented by counsel. At the trial held on October 30, 2018, Jackson represented himself with standby counsel.

Jackson testified that he ended up shot and in possession of a gun based on a confrontation he had with two other individuals he knew. According to Jackson, he was walking down a street when Robert Patton and Jerry Eldridge confronted him.[1] Eldridge pulled a gun on Jackson and demanded marijuana and money. Jackson grabbed the gun from Patton and fought with him. Then Eldridge shot Jackson in the leg, and Patton and Eldridge jumped in a vehicle and drove away.

Jackson testified he was disoriented from being shot, and when the police arrived he was in shock and made many bizarre statements. He stated that while at the hospital he eventually went along with the story the detective wanted to hear, that he had shot himself.

On October 30, 2018, the jury convicted Jackson on counts one and three of his indictment. The jury found Jackson was a convicted felon in possession of a handgun. It found Jackson was not privileged to possess the firearm to protect himself or others and recommended the maximum sentence of ten years of incarceration. After the PFO portion of the penalty phase, the jury found Jackson was guilty of being a PFO-1 and recommended sentencing him to eleven years. After a presentence investigation, on January 8, 2019, the final

---

[1] These were not the Arab man and skinny white man he described to police after he was arrested.

judgment was entered in accordance with the jury's recommendation and count two, carrying a concealed deadly weapon, was dismissed.

Jackson appealed and requested the appointment of the DPA to represent him on appeal because he remained indigent. The trial court granted Jackson's request.

Jackson argues he did not knowingly, intelligently, and voluntarily waive his right to counsel. Before we address this issue, we briefly review the myriad of hearings addressing whether Jackson was competent to assist in his own defense and to waive his right to counsel and whether he should represent himself, be co-counsel with his attorney, have standby counsel, or resume being represented by counsel.

At the *Faretta* hearing on whether Jackson was competent to represent himself, the trial court asked questions about Jackson's education and what he knew about the law. Jackson made references to the Uniform Commercial Code and being "the authorized representative and beneficiary of the legal entity of all capital letter name[.]" Jackson stated he completed the tenth grade, learned to read and write, had no major difficulties in reading or writing, and had been to court before but had not represented himself before. The trial court explained the charges Jackson was facing and the possible sentence terms and asked him, "What gives [you] confidence that you can represent yourself facing these serious

charges?"  Jackson responded, "Because I've studied the Constitution and the Constitution is the supreme law of the land and any law repugnant to the Constitution is null and void, of law, case in point, *Marbury vs. Madison*, 5 U.S. 173, your honor."  The Commonwealth declined to ask Jackson any questions.

The trial court stated that it would not be comfortable letting Jackson do everything in the case considering the serious nature of the charges against him, explaining that it wanted Jackson and his attorney to work together.  Jackson objected to this arrangement, explaining, "I'm not giving him power of attorney over me."  He stated he would be comfortable having the attorney "sit as a reference, but having control and being able to speak without my authority, I do not give him that right" because he was "competent" and "not suffering from constitutional psychopathic inferiority, in the least."

The trial court responded that Jackson was not inferior and "had some smarts" but thought it would "be good to have an attorney right now representing you."

Jackson again objected to this arrangement, explaining, "I cannot have him representing me to where he can speak" where he had not given him "power of attorney over me."  Jackson contrasted the "flesh and blood" version of himself with the "all capital letter" version of himself.

Later, Jackson's counsel requested a competency hearing of Jackson and he was evaluated at the Kentucky Correctional Psychiatric Center. At the competency hearing, Dr. Britton opined that Jackson was competent but admitted that he made unusual statements about the criminal justice system, which she characterized as "unusual political beliefs" consistent with the "sovereign citizen" political movement.

In a December 1, 2017 hearing, Jackson's counsel asked for clarification of his role as "co-counsel" and whether that was the same as standby counsel. Jackson opined that he did not want counsel to speak for him but wanted counsel to be a little more than standby because he had never been in a trial before, explaining he did not want counsel to make decisions for him or do things in court without his approval. The trial court made a specific finding that Jackson met the *Faretta* standard, was smart, capable, and sophisticated, and could represent himself.

Trial was scheduled for March 19, 2018. On March 14, 2018, Jackson's counsel filed a motion to continue the trial, explaining that Jackson no longer wished to represent himself and the additional time was needed for counsel to be prepared to represent Jackson. The Commonwealth opposed the motion, arguing that Jackson had used a "sovereign citizen" approach to delay the trial and play games. At the hearing on the motion held on March 16, 2018, after the trial

court reviewed the history of Jackson asking to represent himself, the following exchange took place:

> Trial Court:  Now you don't want to represent yourself?
>
> Jackson:  Yes, I found out some of the remedies I was going to use are fraudulent and there is no use in continuing in that way.  It would be insane.
>
> Trial Court:  So, you're withdrawing your request to represent yourself?
>
> Jackson:  Yes, your Honor.
>
> Trial Court:  But now you know, if I do that, we're not going to go back.  We're not playing games with the court, you understand that?
>
> Jackson:  Of course.
>
> Trial Court:  So, from now on you don't talk, your attorney talks.  You understand that.
>
> Jackson:  Yes.
>
> Trial Court:  Okay, alright, based on that I'm going to allow him to withdraw his request to represent himself and allow [Jackson's attorney] to be counsel.

The trial court granted the motion to continue the trial until June 20, 2018.  However, Jackson, who was out on bond, failed to appear on that date and was subsequently arrested.

At the June 29, 2018 status hearing, Jackson's counsel stated that the previous night Jackson told him he did not wish to ever speak to him again and

counsel asked for the matter to be addressed. The trial court stated that Jackson could represent himself and counsel could be standby and that if Jackson did not want to talk to counsel he did not have to talk to him. Jackson told the trial court that he was frustrated that in working with his counsel on trial strategy, his counsel was not helping him adequately and not getting him the records that he wanted, and he was worried that he was not going to have a proper defense. Jackson asked for his bond to be reinstated because he was working, and he wanted the money to hire his own lawyer. The trial court denied the request.

At the status hearing held on October 26, 2018, the trial court asked Jackson if he wanted to keep representing himself. Jackson responded:

> Well the real issue with that, with representing myself, is I couldn't get the cooperation I needed to fight the case with [my attorney] and I actually asked for another attorney, and then I was, when you said I couldn't have another attorney, well I guess I am representing myself. I wouldn't mind having another attorney. He and I do not see eye-to-eye for some reason.

After a discussion about the fact that counsel had another trial scheduled and possibly another attorney from the DPA would be stepping in as standby counsel, but that Jackson would be "running the show," Jackson stated that he was not ready to do a trial, but would do so rather than have his original attorney, but would not mind having another attorney. The trial court then asked Jackson about the difficulties that Jackson had with getting along with counsel.

-8-

Jackson explained that the attorney was always arguing about what the prosecutor was going to do, and he wanted someone to help him build a defense. The attorney explained that Jackson had received all discovery and he had his investigator subpoena everyone that Jackson wanted and assisted him in gathering evidence.

The trial court suggested that while Jackson had a right to represent himself that he might want to rely on his attorney for jury selection. Jackson responded that he could not trust his attorney and did not want him to have any power over him.

Jackson asserts on appeal that the trial court's error in forcing him to represent himself even though he did not knowingly, intelligently, and voluntarily waive his right to counsel was preserved by Jackson telling the trial court on December 1, 2017, that he did not want to represent himself. He states that to the extent this error is not preserved, that it is a structural error which should be reviewed as palpable error. While noting that "no script is always required or always sufficient for a *Faretta* hearing," Jackson heavily relies on the trial court's failure to ask the model questions set out in *Commonwealth v. Terry*, 295 S.W.3d 819, 824-25 (Ky. 2009) (quoting *United States v. McDowell*, 814 F.2d 245, 251-52 (6th Cir. 1987)).

We disagree that this error was preserved because after Jackson was allowed to withdraw his request to represent himself, he opted to represent himself

rather than to have his court-appointed attorney represent him.  We agree that the failure to comply with the *Faretta* requirements can be a structural error which would "render the trial fundamentally unfair" and "warrant automatic reversal[.]" *Marcum v. Commonwealth*, 583 S.W.3d 24, 29 (Ky.App. 2019) (quoting *McCleary v. Commonwealth*, 410 S.W.3d 597, 604 (Ky. 2013)).  However, we disagree that in this instance Jackson's rights were violated.

Trial courts have to balance two competing sets of rights as established by the Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution when it comes to a criminal defendant seeking self-representation:  the guarantee to the right to counsel and the right to self-representation.  *Faretta*, 422 U.S. at 832-34, 95 S.Ct. at 2539-41; *King v. Commonwealth*, 374 S.W.3d 281, 290 (Ky. 2012).  "When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel."  *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541.  A waiver of the right to counsel can be made knowingly, voluntarily, and intelligently as long as a defendant is "alerted generally [by the trial court] to the difficulties of navigating the trial procedure *pro se*" having been "adequately cautioned" so as to have "an appropriate understanding of the dangers of self-representation" through having been provided with "enough information to assure that [the defendant's] waiver of counsel was done with 'eyes open.'"  *Lamb v.*

-10-

*Commonwealth*, 510 S.W.3d 316, 321 (Ky. 2017) (citing *Grady v. Commonwealth*, 325 S.W.3d 333, 342 (Ky. 2010); *Terry*, 295 S.W.3d at 825).

> [A] defendant's lack of knowledge of the rules of court, criminal procedure, and evidence is irrelevant with respect to whether his waiver of the right to counsel was made knowingly, intelligently, and voluntarily; that he acknowledges this deficiency is relevant. Similarly, a defendant's dissatisfaction with appointed counsel is essentially irrelevant to this determination. It is the defendant's constitutional right to waive for whatever reasons he deems sufficient.

*King*, 374 S.W.3d at 295 (citation omitted).

Although the Kentucky Supreme Court quoted with approval a list of questions for *Faretta* hearings in *Terry*, it clarified:

> We reiterate that no script for the trial court is required or is always and invariably sufficient for all circumstances in which a defendant seeks to waive the right to counsel. And we do not intend to say that a failure to follow the model questions listed above is reversible error. Rather, we quote these model questions because they provide what we believe to be a good guide for a *Faretta* hearing.

*Terry*, 295 S.W.3d at 825. "The actions required of a trial court addressing a defendant's waiver of counsel . . . are not rigidly defined." *Grady*, 325 S.W.3d at 342. We take "a pragmatic approach whereby we simply question on appeal, in light of the entire record and on a case-by-case basis, whether the defendant's waiver of counsel was done knowingly, intelligently, and voluntarily." *Id.* "[W]here a trial court warns a defendant of the dangers he faces and makes a

simple determination that a defendant can represent himself, the decision will stand where the record supports that finding." *Id.* at 343.

The situation in *King* was similar to the situation with Jackson in that in each case the defendant's primary reason for wishing to represent himself was dissatisfaction with appointed counsel. Jackson stated that he did not see "eye-to-eye" with his counsel and he might want counsel if he could have different appointed counsel or pay for his own, but if that was not an option, he preferred to represent himself; King stated that he was not getting along with counsel and did not feel prepared for trial but preferred representing himself to allowing counsel to do it. In reversing the trial court's decision to deny the defendant the right to represent himself in *King*, the Kentucky Supreme Court ruled that the trial court erred because disapproval of a defendant's motive for self-representation was not a sufficient reason for finding that a waiver of counsel was not knowing, intelligent, and voluntary, explaining, "It is the defendant's constitutional right to waive for whatever reasons he deems sufficient." *King*, 374 S.W.3d at 295.

Given the evidence before us, we are confident that Jackson was competent to represent himself and unequivocally indicated his desire to do so. Jackson was playing games with the trial court by repeatedly going back and forth on whether he wanted to represent himself, thereby causing delays. The trial court did its utmost to respect Jackson's right to self-representation and his right to have

counsel. Ultimately, Jackson opted to represent himself and such a decision was made knowingly, intelligently, and voluntarily. There was no error.

Jackson argues that by permitting the Commonwealth to improperly comment on his right to remain silent despite his attorney's advice, the trial court violated Jackson's right to counsel. We disagree.

Jackson was not silent when he was arrested and given *Miranda* warnings. Instead he gave two different versions of how he came to be injured to the police—that he was attacked by an Arab man and a skinny white man and then that he shot himself. At trial, he gave a third version of events in which he implicated two other individuals.

The Commonwealth asked Jackson on cross-examination if he ever told this story to the police. Standby counsel objected. During a bench conference, standby counsel stated that once he was appointed, he advised Jackson not to talk to the police. The Commonwealth argued it was entitled to explore whether Jackson's current story was a fabrication. The trial court determined it was a legitimate question to explore why a victim of a crime did not report it to the police and Jackson could explain himself.

*Taylor v. Commonwealth*, 276 S.W.3d 800 (Ky. 2008), is directly on point and controlling. In *Taylor*, the defendant argued that the trial court violated his right to remain silent by allowing the Commonwealth to cross-examine him

-13-

regarding his failure to disclose exculpatory statements to the trial court or

detectives in the years prior to his trial. The Kentucky Supreme Court held that

such questions did not infringe on the defendant's right to remain silent,

explaining:

> The United States Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that the Due Process Clause of the Fourteenth Amendment is violated when a prosecutor impeaches the defendant's trial testimony by referring to the fact that he remained silent after being arrested and being advised of his *Miranda* rights. In *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), however, the Court explained that the prohibition in *Doyle* "does not apply to cross-examination that merely inquires into prior inconsistent statements." Thus, if after receiving the *Miranda* warnings the defendant does not invoke his right to remain silent and instead provides a statement to the police, it is permissible to cross-examine the defendant on how and why his prior statement is inconsistent with his trial testimony. *Id.* at 408-409, 100 S.Ct. 2180. The *Anderson* Court reasoned that this type of cross-examination "makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* at 408, 100 S.Ct. 2180.

> Here, because Taylor voluntarily provided a statement to the police and did not remain silent after receiving his *Miranda* rights, it was permissible for the prosecutor to cross-examine Taylor about the discrepancies between his prior confession and his trial testimony. This includes asking Taylor why, if his prior statement to the police was false and his current trial testimony is true, he did not reveal it to anyone prior to trial. Furthermore, asking Taylor if he had disclosed his innocence to the trial judge or the detectives also did not

-14-

infringe on Taylor's constitutional right to remain silent because, as noted above, he waived this right.

Although both of these questions were proper under *Anderson*, *supra*, the latter question regarding why Taylor did not talk to the trial judge or the detectives has been challenged as improperly suggesting that defendants have a duty to come forward and disclose their exculpatory statement to state actors. Clearly no such duty exists and counsel should avoid any questions implying as such. However, cross-examination questions which simply reflect that a defendant has had the opportunity pretrial to inform the judge or detectives of his recantation and has not done so are not improper. We believe the questions at issue fall in the latter category. Thus, the trial court did not err in permitting the Commonwealth to cross-examine Taylor about his prior inconsistent statement.

*Id.* at 808-09.

Pursuant to *Taylor*, it was appropriate for the Commonwealth to cross-examine Jackson about his previous statements about how he came to be injured and as to why, if he later determined these accounts were faulty, he never tried to correct his misstatements.

Jackson argues that the trial court erred by precluding Jackson from telling the jurors what his assailants told him and what he knew about them, thereby depriving him of the opportunity to present a complete defense. He argues such testimony would have been proper as non-hearsay because it went to their state of mind to rob and kill him, and their threats were admissible to prove that Jackson feared them and could properly engage in self-defense.

-15-

Only a single objection was made by the Commonwealth about Jackson's testimony regarding his assailants. The Commonwealth objected when Jackson was asked by standby counsel about whether Patton was mad that Jackson had dated his ex-girlfriend. At the bench conference, the Commonwealth explained that it was objecting to testimony about Patton's state of mind, what he knew, what he was mad about, and any hearsay about what he said and also complained the Commonwealth had never heard about this individual in connection to this case. The trial court instructed that Jackson could not testify about Patton's state of mind or what he said but could talk about what Jackson saw or did.

Jackson proceeded to testify without interruption about previous incidents with Patton and Eldridge and their reputations, and what occurred between them which resulted in Jackson coming to possess the firearm and being shot. There is absolutely no indication that there was anything else of substance that Jackson wished to testify about regarding Patton and Eldridge which he was denied. We have no difficulty in concluding that the trial court properly explained what Jackson could and could not testify about. Without attempting to put on any other proof which was then denied pursuant to an objection by the Commonwealth, there is simply neither error nor preservation of error.

-16-

Finally, Jackson argues that the trial court erred in allowing the bailiff to follow him everywhere which would result in the jury speculating why he was so dangerous, and this act was equivalent to shackling him.

This is not the argument that Jackson made to the trial court. Jackson simply asked if the trial court could keep the bailiff from following him. The trial court explained that Jackson was in a dual role as an attorney and the defendant and the bailiff was there for everyone.

Having observed the trial footage, Jackson was apparently complaining that the bailiff approached the bench when counsel approached the bench. The bailiff was not right next to Jackson but in the general vicinity.

As explained in *Holbrook v. Flynn*, 475 U.S. 560, 568-69, 106 S.Ct. 1340, 1345-46, 89 L.Ed.2d 525 (1986), "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." It noted, however, that the presence of four guards, even if slightly prejudicial, could be justified by "the State's need to maintain custody over defendants who had been denied bail after an individualized determination that their presence at trial could not otherwise be ensured. Unlike a policy requiring detained defendants to wear prison garb, the

deployment of troopers was intimately related to the State's legitimate interest in maintaining custody during the proceedings[.]" *Id.* at 571-72, 106 S.Ct. at 1347.

In *Rigdon v. Commonwealth*, 522 S.W.3d 861, 866 (Ky. 2017), after a thorough review of *Holbrook* which included agreement that in some circumstances such a deployment of additional security might create an impression that the defendant is dangerous and untrustworthy, the Court held that the presence of one uniformed officer and a bailiff was not prejudicial to the defendant and noted that this was consistent with its previous case of *Soto v. Commonwealth*, 139 S.W.3d 827, 875 (Ky. 2004), which held that the presence of three uniformed officer and one plain-clothes officer was not excessive and did not deprive the defendant of the presumption of innocence.

In examining Jackson's situation, we see nothing inherently prejudicial about the bailiff approaching with counsel for bench conferences. There was no additional security deployed beyond the standard bailiff, Jackson was in custody, and Jackson had a degree of freedom of movement which was different from defendants who would remain seated. There was nothing to specifically identify for the jury that the bailiff was approaching the bench to keep close to Jackson. Indeed, often the bailiff stood closer to Jackson's standby counsel or the Commonwealth's attorneys than to Jackson. Additionally, typically several feet separated the bailiff from Jackson, who was far closer to standby

-18-

counsel, the Commonwealth's attorneys, and the judge. Furthermore, Jackson did not articulate why the bailiff's presence was problematic to the jury or would interfere with the presumption of his innocence. While Jackson may have been all too aware that the bailiff was close at hand because of him, we have no reason to think the jury would interpret the bailiff's actions as equating to Jackson being guilty, rather than simply acting in an appropriate and prudent manner commiserate with any defendant, or anyone, approaching the bench.

Accordingly, we affirm Jackson's conviction and sentence by the Fayette Circuit Court.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Brandon Neil Jewell
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General
Frankfort, Kentucky