J-A12001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ABDULA J. RICHARDSON, | |
| Appellant | No. 1204 WDA 2017 |

Appeal from the Judgment of Sentence Entered October 8, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0005607-2014

BEFORE: BENDER, P.J.E., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED JULY 1, 2019**

Appellant, Abdula J. Richardson, appeals from the aggregate judgment of sentence of 3½-7 years' incarceration, imposed after a jury convicted him of four counts of conspiracy,[1] two counts of false reports to law enforcement authorities,[2] and one count of retaliation against witness, victim or party (hereinafter "Retaliation").[3] After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

---

[1] 18 Pa.C.S. § 903; the target crimes included 2709(a)(4) (harassment—communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures), 2709(a)(5) (harassment—communicates repeatedly in an anonymous manner), 4905 (false alarms to agencies of public safety), and 5105 (obstructing administration of law or other governmental function).

[2] 18 Pa.C.S. § 4906.

[3] 18 Pa.C.S. § 4953.

The evidence admitted at trial established that between February 1, 2014 through April 12, 2014, 128 false 911 calls were made from the residence located at 3056 Bergman Street in the City of Pittsburgh. [Appellant] resided at this residence with his wife, co-defendant Felecia Richardson, and his three younger sons. The credible evidence established that all of the 911 calls were false and that the calls were usually made by [Appellant]'s fifteen-year-old son with a few of the calls made by his twelve-year-old son. City of Pittsburgh police officers responded to all of the 911 calls that involved actual complaints. A number of the 911 calls were simple hang-up calls that did not resolve in a formal request for emergency action.

A substantial number of the 911 calls were traced to landline telephones at the 3056 Bergman [Street] address. At all times relevant to this matter, there was no more than one landline at the residence. Initially, the landline 911 calls were traced to telephone number 412-771-0204. On March 13, 2014, the landline telephone number associated with [Appellant] was changed to 412-771-1470. On March 29, 2014, law enforcement officers executed a search warrant at the 3056 Bergman [Street] address and seized the landline telephone. After that date, on March 31, 2014 through April 4, 2014, additional false 911 calls were made by a cellular phone subscribed to by [Appellant]. Officers attempted to locate the cellular phone that made these calls but [Appellant] and his wife initially denied the existence of the cellular phone. The Richardsons later accused police officers of stealing the cellular phone. When police officers responded to the 911 calls, on every single occasion, there was no emergency and the officers cleared the incident and left the scene.

Over the time period of the false 911 calls, many different police officers responded to the calls. [Appellant] and his wife steadfastly denied that the 911 calls originated from their residence or cell phones owned by them. They claimed that someone must have been pranking them or tapping or spoofing their telephones. Verizon and Sprint telephone records and expert testimony, however, contradicted these claims and proved that the 911 calls originated from their residence and/or cell phones. Additionally, a "chirping" sound could be heard on the 911 calls. When officers responded to the false 911 calls at 3056 Bergman [Street], they heard the same chirping sound being emitted from a fire alarm inside the residence. Similarly, a barking dog could be heard on the 911 calls. The same barking dog was present at the residence when officers were at the residence responding to

the 911 calls. On one false 911 call made by one of [Appellant]'s sons, an adult male was heard sneezing in the background.

Typically, officers responding to the 911 calls would be greeted by a barking dog and the Richardsons would come out from the house onto the porch and would take video of the police officers with their cell phones. Sometimes only [Appellant] would come onto the porch. Sometimes it was [Appellant]'s wife and sometimes it was his entire family who appeared. The interactions were hostile and aggressive. [Appellant] and his family would degrade the officers and call them profane, vulgar and racist names. Often times the calls would come at night and the Richardsons would have items in their hands that couldn't be identified. The officers feared for their safety. [Appellant] would not permit his children to be interviewed by law enforcement so officers could investigate the substance of the complaints. The complaints ranged from violent domestic assaults to injuries being sustained by the children. Neither [Appellant] nor his wife would permit law enforcement officers to enter the residence. Often, [Appellant] and his family members were already on the porch of the residence awaiting the arrival of the police officers wielding their cellular phones and taking video of the police officers.

The evidence also established that [Appellant] was incarcerated for intermittent periods while awaiting trial. The false 911 calls stopped when [Appellant] was incarcerated. However, they resumed when he was released from jail and returned to his residence [at] 3056 Bergman [Street].

The evidence further established that the City of Pittsburgh Bureau of Police expended substantial man[-]hours responding to the false 911 calls and that the false calls resulted in a shortfall of officers available to respond to other, serious calls. Evidence was admitted that 259 police reporting units were required to respond to the false 911 calls over the span of 22 days. A total of 430 hours were spent responding to the false 911 calls. The cost associated with the false 911 calls was approximately $11,000.

Additional evidence, jail calls of [Appellant], established that his intent was to bait the officers into doing something that would permit him to sue the City of Pittsburgh. [Appellant] was angry after he was arrested in September [of] 2013 and charged with assault. He made numerous claims that he was being set up by the police. He threatened the police officer who made the September arrest. [Appellant] posted the video of [the] officer

- 3 -

responding to the false 911 calls on social media pages criticizing the police officers. During the time period of the false 911 calls, [Appellant] had been seeking election as the mayor of the City of Pittsburgh and he wanted to use his exchanges with the police officers as part of his election campaign.

The Commonwealth also presented evidence that [Appellant] eventually moved from 3056 Bergman Street to 217 Bessemer Street, Apartment #2[,] in the East Pittsburgh section of the City of Pittsburgh during the pendency of the instant case. False 911 calls were made from that residence after [Appellant] moved to that area.

While officers where at 3056 Bergman [Street] responding to a 911 call, they would sometimes contact the 911 call center and ask for a "call back" to the number that made the 911 call. The 911 dispatcher would call the number that originated the 911 call. Officers could hear the landline telephone inside 3056 Bergman ring and, at least on one occasion, even answered it.

On March 29, 2014[,] officers obtained a search warrant and seized the landline telephone from the residence. The very same day, after the landline phone had been seized, another 911 call was placed from 3056 Bergman [Street], this time from a cell phone. Upon arriving at the scene, officers questioned [Appellant] and his wife about the telephone number that made the 911 call. [Appellant] claimed he didn't recognize the number from which the 911 call was made. His wife claimed that they did not have a telephone that had a 412 area code. However, as set forth above, subsequent investigation determined the number that made the false 911 calls was a cell phone that was subscribed to by [Appellant].

The Allegheny County 911 system recorded various information when a 911 call would be made. When a 911 call was placed from a landline, the 911 system would record the home telephone number, the address from which the call was made and the identity of the person to whom the telephone line [was] registered. The information obtained from a landline-based 911 call is 99.9% accurate. If the 911 call was made from a cell phone, the information obtained depended on the type of cell phone used to make the 911 call. If the cell phone was a "phase one" phone, which is an older cellular phone (typically five or more years old), the nearest cellular tower would be disclosed. If the phone was a "phase two" cell phone, a newer phone equipped with global

positional satellite ("GPS") technology, the location of the call would be disclosed within 50 meters of the actual location of the call 66% of the time. The location of the call would be accurate within 150 meters 95% of the time. The evidence established that the false 911 calls were either made from landline[] telephones or cellular phones subscribed to by [Appellant].

It was clear that [Appellant] and his family anxiously awaited the arrival of police officers responding to the false 911 calls. The family usually had their telephones ready for the police before the police officers even responded to the calls. Officers who responded to the calls were repeatedly met with offensive insults. Officers were called "white devil" and the "N word." They were claimed to have "bloody fangs" and family members claimed that they "were going to win in the end." Officers repeatedly asked [Appellant] and his wife to listen to the calls in an effort to resolve the issues. Both [Appellant] and his wife refused to listen to the calls. Officers asked them for permission to push the redial button on the landline phone to show [Appellant] and his wife that the 911 calls emanated from their residence. [Appellant] and his wife refused to permit officers to do it. On most occasions, [Appellant] would not permit officers to speak to his family members about the origins of the 911 calls. Neither [Appellant] nor his wife would cooperate with the police officers and they repeatedly denied that the calls were coming from their residence. Responding officers began filming the interactions because the interactions were so unusual.

The following paragraphs detail[] examples of some of the false 911 calls:

On March 11, 2014, officers responded to 3056 Bergman [Street] for unknown trouble. Upon arriving at the scene, [Appellant] advised the responding officers that there was no emergency at his residence. He advised the officers that his telephone was being tapped due to the fact that he was planning to run for mayor of the City of Pittsburgh. The officers advised [Appellant] to call the phone company to check his line.

On March 14, 2014, officers responded to 3056 Bergman [Street] for a call from a woman claiming to being assaulted by her husband who had a gun. When the officers arrived, two of [Appellant]'s children were the only residents at home. Just after the officers appeared at the residence, [Appellant] came running down the street screaming at the officers. [Appellant] began

speaking in an aggressive tone and demanded to know why the officers were there.  Officer Luff, one of the responding officers, was a victim o[f] the September[] 2013[] assault case that was pending against [Appellant].  [Appellant] yelled to Officer Luff that, "I know you are behind these bogus calls.  I won't rest till I get you."  Officers check[ed] the residence and no females were found in the residence.  After the officers left, three additional false 911 calls were made that day.

On March 23, 2014, officers responded to 3056 Bergman [Street] for a hang up call.  [Appellant] and his family exited the residence videotaping the officers.  [Appellant] stated that nobody in his residence called 911 and accused the officers of harassment.  After the officers left, two more false 911 calls were made that day.

On March 30, 2014, officers responded to 3056 Bergman [Street] for a domestic violence call.  The caller claimed to be [Appellant]'s wife and claimed that [Appellant] was assaulting her.  The caller claimed that there was a machete in the closet.  From prior calls, officers knew that there were machetes in the residence.  As they arrived on scene, officers were being videotaped by [Appellant] and his family.  After officers left, two more 911 calls were made alleging similar acts of domestic violence.  The calls were made from a cellular phone.  [Appellant] falsely denied that he or anyone in his family had a cellular phone.

Trial Court Opinion ("TCO"), 6/20/18, at 2-8.

Following a trial held from July 8, 2015 to July 21, 2015, a jury found Appellant guilty of the above-stated offenses.  On August 10, 2015, the trial court sentenced Appellant to 2½-5 years' incarceration for conspiracy— false alarms to agencies of public safety, and to a consecutive term of 1-2 years' incarceration for Retaliation.  No further penalty was imposed at all remaining counts.

Appellant did not immediately file a direct appeal. Instead, on June 24, 2016, he filed a timely, *pro se* PCRA[4] petition. The trial court appointed counsel, who then filed an amended PCRA petition on Appellant's behalf. The Commonwealth conceded that Appellant was entitled to the relief sought therein and, on July 11, 2017, the PCRA court reinstated his post-sentence and direct appeal rights. Appellant filed a post-sentence motion *nunc pro tunc* on July 21, 2017, which was denied on July 24, 2017. On August 23, 2017, Appellant filed a notice of appeal *nunc pro tunc*. He filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on September 13, 2017, and the trial court issued its Rule 1925(a) opinion on June 20, 2018.

Appellant now presents the following questions for our review:

   I.   Section 4953 of the Crimes Code prohibits retaliation against another for "anything lawfully done in the capacity of witness, victim or a party in a civil matter." Was the evidence insufficient to convict Appellant of this offense since there was no evidence presented regarding any witnesses, victims, or parties "in a civil matter"?

   II.   The lower court permitted testimony related to a prior bad act involving Appellant and Officer Shawn Luff, which pre-dated Appellant's charges. Was the admission of this testimony improperly [admitted] based upon the lower court's misreading of the retaliation statute (18 Pa.C.S. § 4953), and therefore did the lower court abuse its discretion?

   III.   The lower court permitted numerous uniformed police officers to hear opening statements, and obtain a "sneak peek" of the Commonwealth's evidence and theory of the case, over the defense's sequestration request. Did the

---

[4] Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546.

lower court's denial of sequestration have an unduly prejudicial effect on Appellant's guarantee to a fair trial?

IV. The lower court imposed upon Appellant an extra–aggravated sentence outside of the sentencing guidelines. Did the lower court abuse its discretion by imposing the sentence it did?

Appellant's Brief at 5.

Appellant's first claim concerns the sufficiency of the evidence supporting his conviction for Retaliation.

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted). "A person commits" the offense of Retaliation "if he harms another by any unlawful act or engages in a course of conduct or repeatedly commits acts which threaten another in retaliation for anything lawfully done in the capacity of witness, victim or a party *in a civil matter*." 18 Pa.C.S. § 4953(a) (emphasis added).

Instantly, Appellant argues that the phrase, 'in a civil matter,' in the definition of Retaliation, acts to modify all preceding terms, such that a conviction for Retaliation is contingent on the Commonwealth's proving the existence of a prior or ongoing civil matter. Appellant's Brief at 43. Appellant

admits the ostensible presence of an alternative interpretation, whereby only the term 'party' is modified by the subsequent phrase, 'in a civil matter.' **Id.** at 45. Indeed, Appellant also concedes that several principles of statutory construction support the latter interpretation. **See id.** at 47-51. Thus, Appellant relies solely on the lenity principle to support the former interpretation, which, certainly, is more favorable to him. **Id.** at 51-52. When a criminal statute is capable of sustaining two reasonable interpretations, the rule of lenity dictates that we must adopt the interpretation that is more favorable to the defendant. Appellant contends, therefore, that lenity dictates that this Court interpret the Retaliation statute such that it only applies where a defendant threatens civil witnesses, civil victims, and/or civil parties.

However, in **Commonwealth v. Nevels**, 203 A.3d 229 (Pa. Super. 2019), this Court expressly rejected Appellant's interpretation of the Retaliation statute:

> Prior to December 20, 2000, Section 4953 read: "[a] person commits an offense if he harms another by any unlawful act in retaliation for anything lawfully done in the capacity of witness or victim." 18 Pa.C.S.[] § 4953(a) (prior version). However, the current version, which took effect on December 20, 2000, added the phrase "or a party in a civil matter." 18 Pa.C.S.[] § 4953(a). Since coming into effect, the statute has been applied, by both the Pennsylvania Supreme Court and this Court, to victims and witnesses in criminal proceedings. **See, e.g.**, **Commonwealth v. Ostrosky**, … 909 A.2d 1224, 1232-1233 ([Pa.] 2006) (holding that Section 4953 did not apply to victims of a criminal proceeding only because a single threat did not result in objective harm to victims); **Commonwealth v. Brewer**, 876 A.2d 1029 (Pa. Super. 2005) (affirming conviction under Section 4953 of retaliation against witnesses in a criminal proceeding), *appeal denied*, … 887 A.2d 1239 ([Pa.] 2005). We therefore conclude, mindful of

relevant case law and the rules of statutory interpretation, that retaliation against victims or witnesses in criminal proceedings may be properly prosecuted under Section 4953.

*Commonwealth v. Nevels*, 203 A.3d 229, 243 (Pa. Super. 2019) (footnote omitted). "This panel is not empowered to overrule another panel of the Superior Court." *Commonwealth v. Beck*, 78 A.3d 656, 659 (Pa. Super. 2013). Accordingly, we must conclude that Appellant's sufficiency claim lacks merit.

In his second claim, Appellant contends that the trial court abused its discretion when it admitted prior-bad-acts evidence concerning Appellant's previous interaction with Officer Shawn Luff. However, Appellant's argument is wholly contingent upon his interpretation of the Retaliation statute, which we have rejected, *supra*.[5] Accordingly, Appellant's second claim lacks merit.

In his third claim, Appellant contends that the presence of 20-25 uniformed police officers in the courtroom during opening arguments deprived him of a fair trial. Appellant argues that such a large number of officers constituted a "critical mass of police presence" that created an "unacceptable risk of the jury being pulled, either consciously or subconsciously, to the side of law enforcement [and] the Commonwealth." Appellant's Brief at 62. Appellant also asserts that he was prejudiced because those officers "unfairly

_____

[5] Under Appellant's interpretation of the Retaliation statute, his prior criminal conduct involving Officer Luff was irrelevant to proving the elements of that crime. However, under the interpretation of the Retaliation statute adopted by this Court in **Nevels**, the same evidence was *necessary* to proving the elements of retaliation.

- 10 -

received a sneak peak of the highlights of what their testimony would be."

*Id.* On this basis, Appellant contends that he is entitled to a new trial.

> Our standard of review on a trial court's decision to sequester witnesses is based on abuse of discretion. *See Cooper v. Delaware Valley Med. Ctr.*, … 654 A.2d 547, 553 ([Pa.] 1995). Thus, to establish the court's ruling as a basis for a new trial the appellant must demonstrate that the trial court failed to apply the law correctly or acted for reasons of bias or other factors unrelated to the merits of the case. Our scope of review for this analysis is plenary.

*Commonwealth v. Atwell*, 785 A.2d 123, 125 (Pa. Super. 2001). "An abuse of discretion is not merely an error in judgment but requires a finding of bias, partiality, prejudice, ill will, manifest unreasonableness, or misapplication of law." *Commonwealth v. Lepre*, 18 A.3d 1225, 1226–27 (Pa. Super. 2011).

The trial court did not address this claim in its Rule 1925(a) opinion. However, the court provided an extensive discussion of the reason for its decision not to sequester the officers during opening arguments in response to the sequestration request, as follows:

> Defense lawyers make that kind of motion for openings because they don't want the witnesses to be prompted by what you say they are going to say. They don't want the witness to hear the prosecutor say Mr. Hays is going to say, X, Y, Z and then Mr. Hays is in the room for the opening to hear that, so Mr. Hays now knows what he is supposed to say. That's why they don't like witnesses in for openings.
>
> In certain cases I exceed [*sic*] to that, but I am not going to exceed [*sic*] to that in this case, and I am going to tell you why. This case has a very substantial community interest factor on both sides of the prosecution and the defense. What I mean by that is that this case involved allegations that the Defendants participated in a conspiracy, numerous conspiracies, to make false calls to the police to get the police to respond for no great reason

- 11 -

other than to harass the police as I read the materials in the file of this case.

Whether that is true or not, the police, as part of our community, certainly have an interest in the outcome of this case beyond normal police interests. According to the Commonwealth's view of the case, they have been put to task to respond to numerous false calls placing themselves and the public at risk by responding.

There also appears to be, based on what I see in this case, some other aspects of the case that involve the Defendants, [Appellant]'s view of the police and his having run for mayor and all of those issues that came up in his last case. All of this is related from a community interest standpoint.

I am not saying that it is necessarily related to the case, but from a community interest standpoint it is, and I think that the police are entitled to participate in the public trial of this case just like anybody else would be from the standpoint that they have an interest in the case beyond their functioning as police officers. They have an interest as members of the community.

Just like [Appellant] and Mrs. Richardson, particularly [Appellant], who i[n] another forum has voiced interest in the safety of the community, the welfare of the community. He has voiced it verbally, he has voiced it in writing to me personally. In fact, what I received this week was from him-again, I don't want to ask him to verify that-but, again, there is a lot of interest, a lot of community interest coming from all angles of this case, and I think that it would be unfair to the police to say that because you are a police officer that you can't, as a member of our community, witness the public aspects of this trial. So for that reason, [I deny] your request for the officers to be asked to leave the room even if they are witnesses-and I don't know which are and which aren't as we speak.

N.T., 7/6/15, at 37-39. The trial court later clarified that all officers would be permitted to remain in the courtroom for opening arguments, but that any officers who were going to appear as witnesses would be sequestered for the remainder of the of the trial. *Id.* at 40. Appellant contends that the trial court's reasoning did not justify denying his request for sequestration of those

officers during opening arguments, citing **Holbrook v. Flynn**, 475 U.S. 560 (1986), and **Commonwealth v. Gibson**, 951 A.2d 1110 (Pa. 2008).

In **Holbrook**, the United States Supreme Court addressed a claim that the defendant had been denied a fair trial due to "the presence of four uniformed state troopers, sitting in the first row of the spectators' section" of the courtroom for the duration of his trial. **Holbrook**, 475 U.S. at 562. The Court first acknowledged that: "Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." **Id.** at 567 (cleaned up). However, the Court also stated that:

> This does not mean … that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence.

**Id.**

The Supreme Court had previously recognized that certain practices were inherently unconstitutional because they threatened the fairness of criminal proceedings without providing any counterbalancing benefit to a

recognized state policy. *See id.* at 568. For instance, *forcing* a defendant to wear prison clothes was deemed by the Court to be categorically unconstitutional. *See id.* (citing *Estelle v. Williams*, 425 U.S. 501 (1976)). The Court also recognized similar problems with shackles and gags. However, the Court observed that, in extreme circumstances, such as where a defendant is "particularly obstreperous and disruptive" during trial proceedings, shackles and gags might be used without violating the defendant's right to a fair trial. *Id.*

Turning to address the presence of uniformed police officers in a courtroom, the *Holbrook* Court held that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" *was not* "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.* at 568-69. However, the Court further reasoned that:

> [I]t is possible that the sight of a security force within the courtroom might under certain conditions create the impression in the minds of the jury that the defendant is dangerous or untrustworthy. However, reason, principle, and common human experience counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

*Id.* at 569 (cleaned up).

In *Gibson*, a Pennsylvania Supreme Court case applying *Holbrook*, the Court considered a claim that "the presence of numerous uniformed police officers in the courtroom and surrounding areas during the guilt and penalty

phases of his trial created an inherently prejudicial atmosphere thereby depriving him of a fair trial." *Gibson*, 951 A.2d at 1137. However, our Supreme Court rejected that claim, reasoning that, "where the record does not indicate the number of uniformed officers present or any disturbance caused thereby, we conclude that [the a]ppellant cannot demonstrate that an unacceptable risk of the jury considering impermissible factors was created." *Id.* at 1139.

As noted by Appellant, it is true in the case *sub judice* that there were substantially more officers involved than were present in *Holbrook*. Furthermore, in contrast to the circumstances at issue in *Gibson*, the trial court below provided a more definitive count of officers in the courtroom (20-25). However, unlike either *Holbrook* or *Gibson*, the presence of a large number of uniformed officers in the instant case did not extend beyond opening arguments. Moreover, the presence of such a large number of police officers was rationally explained by circumstances surrounding Appellant's criminal charges, rather than by a motivation to intimidate or otherwise influence the jury. This is because the Commonwealth's evidence primarily involved the testimony of numerous police officers as both eyewitnesses and/or victims, a situation that also led to an understandable desire by members of the police community to be present during the trial.

As the *Holbrook* Court stated, there is no presumption that the presence of multiple uniformed police officers in a courtroom, by itself, is so inherently prejudicial that it denies a defendant his or her constitutional right

to a fair trial. ***See Holbrook***, 475 U.S. at 567. In a different context, the unexplained presence of so many officers may have been cause for serious concern regarding the fairness of the proceedings. However, in this case, the number of uniformed officers present was not disproportionately large in light the circumstances that gave rise to Appellant's charges. Moreover, the court's ruling against sequestration was limited to the opening statement phase of a two-week trial, thereby minimizing any prejudice that could have resulted. Furthermore, Appellant has not directed this Court's attention to any "disturbance" caused by the officers during opening statements. ***Gibson***, 951 A.2d at 1139. For these reasons, we ascertain no abuse of discretion in the trial court's refusal to sequester the uniformed officers during the opening statements at Appellant's trial.

Finally, Appellant challenges the trial court's discretion in sentencing him outside the aggravated range of the sentencing guidelines. Appellant contends that the trial court's decision in that regard was patently unreasonable.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. ***Commonwealth v. Sierra***, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
>> [W]e conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence

> appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).
>
> *Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra*, *supra* at 912-13.
>
> As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors. *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006). An appellant must articulate the reasons the sentencing court's actions violated the sentencing code. *Id.*

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010).

Here, the Commonwealth concedes that Appellant "has complied with the technical requirements necessary to obtain review of his sentence," Commonwealth's Brief at 27, and that he presents "a substantial question for this Court's review[,]" *id.* at 28. We agree.[6] Accordingly, we now turn to address the merits of Appellant's discretionary aspects of sentencing claim.

_____

[6] Appellant filed a timely post-sentence motion raising the instant sentencing claim, he filed a timely notice of appeal, and he provided this Court with a Rule 2119(f) statement in his brief. Furthermore, Appellant raises a substantial question for our review. "A claim that the court imposed an

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Hoch*, 936 A.2d 515, 517–18 (Pa. Super. 2007) (citation

omitted).

> Appellant argues that his
>
> sentence is outside the sentencing guidelines and patently unreasonable. The lower court sentenced [him] on Counts 2 and 5 where his guidelines were as follows:
>
> Count 2: Conspiracy (False Alarm to Agency of Public Safety), M1—RS to 6 [months' incarceration], with a +/- factor of 3.
>
> Count 5: Retaliation Against Witness, Victim, Party, M2—1 to 12 [months' incarceration], with a +/- factor of 3.
>
> [Appellant]'s guidelines were based, in part, on a calculated [Prior Record Score] of 1. The lower court's sentence, at least as it pertained to Count 2, far exceeded the limits of the aggravated range of the guidelines. The lower court imposed a two and a half to five year[] sentence, which is a minimum sentence three times what the aggravated guidelines called for. Aside from that being drastic, it was a sentence based upon speculation and unfounded presumptions.

Appellant's Brief at 64-65.

Appellant is correct in that his sentence at count 2 is outside of the

aggravated range of the sentencing guidelines. His sentence at count 5 was

at the top limit of the standard range of the sentencing guidelines. When

---

unreasonable sentence by sentencing outside the guidelines raises a substantial question which is reviewable on appeal." *Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002).

- 18 -

imposing a sentence of incarceration, a trial court "shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721. When reviewing a sentence imposed by a trial court, this Court "shall vacate" that sentence if it is "outside the sentencing guidelines" and "unreasonable." 42 Pa.C.S. § 9781(c)(3). When a sentence is within the guidelines, we are only compelled to vacate when the trial court "applied the guidelines erroneously[,]" 42 Pa.C.S. § 9781(c)(1), or where "application of the guidelines would be clearly unreasonable[,]" 42 Pa.C.S. § 9781(c)(2). "In all other cases the appellate court shall affirm the sentence imposed by the sentencing court." 42 Pa.C.S. § 9781(c). Because Appellant's sentence at count 5 was within the guidelines, and because he does not argue that the guidelines were erroneously applied, or that it was clearly unreasonable to apply the guidelines with respect to that count, we ascertain no abuse of discretion with regard to that aspect of Appellant's aggregate sentence.

Appellant argues that it was clearly unreasonable for the trial court to impose the outside-the-guidelines sentence at count 2. The trial court justified its departure from the guidelines as follows:

> [Appellant]'s conduct can only be described as willful, deliberate, repeated and designed to wreak havoc on the City of Pittsburgh Police Bureau. [He] participated in conduct that resulted in over 100 false 911 calls being made without any legitimate purpose. Many police officers were dispatched to the scene to respond to

- 19 -

the false 911 calls. Police officers responding to the calls were unable to respond to legitimate 911 calls. The false calls cost the city of Pittsburgh in excess of $11,000 to compensate the officers and 911 technicians to process the false 911 calls. This [c]ourt took particular note that [Appellant] did not stop his unlawful conduct while the instant charges were pending. Incredibly, [he] continued to participate in a conspiracy to make false 911 calls during the pretrial course of this case. He ultimately pled guilty to the charges of making the additional false 911 calls. In this [c]ourt's view, [Appellant] thumbed his nose at this [c]ourt, law enforcement[,] and the law[,] and continued his affront after he was placed on formal notice of criminal charges for making false 911 calls.

This [c]ourt considered the fact that [Appellant is] a very intelligent man. He used his children to participate in the criminal conduct. [Appellant] encouraged his wife and children to further his personal animus toward the City of Pittsburgh Police Department. He facilitated a complete lack of respect and authority for the police officers who responded to the false 911 calls. He even made false accusations that police officers stole his cell phone. [Appellant] orchestrated and encouraged a deluge of vulgar, hostile and racial slurs toward the officers. The criminal conduct was a persistent pattern of conduct that lasted over time and continued despite the best efforts of the police officers to convince [Appellant] and his wife to stop their unlawful behavior. The evidence was clear that [Appellant]'s conduct was fueled by a desire for retaliation for his arrest on September 3, 2013.

This [c]ourt could also not ignore the fact that every time a false 911 call was made, officers rushed to 3056 Bergman [Street]. During each call, officers travelled at high speeds risking their own safety as well as the safety of the local community and motorists. Police officers were dispatched to 3056 Bergman [Street] rather than being available for legitimate 911 calls. Based on the totality of the circumstances, this [c]ourt believed [Appellant] was a danger to the community and his removal from the community for a substantial period of time was necessary. This [c]ourt considered [Appellant]'s rehabilitative needs, protection of the public, deterring [Appellant] from engaging in future similar conduct, deterring the public from committing such crimes, retribution and the impact on the victim. The sentence imposed in this case was not unduly harsh and properly reflected [Appellant]'s culpability in this case.

TCO at 18-20.

Appellant believes the trial court drastically overstated his dangerousness to the community. He essentially asserts that because the trial court could not quantify certain aspects of the public harm caused by Appellant's course of conduct, his purported dangerousness was purely speculative.

We disagree with the notion that the trial court had to identify specific examples of harm to justify characterizing Appellant as dangerous to the community. The risks created by Appellant's conduct were not insignificant merely because they did not come to fruition. As identified by the trial court, there was a substantial danger to the community created by responding police officers, who risked some level of harm to the community by quickly responding to the 911 calls. Normally, that risk is justified by the immediate need giving rise to a 911 call in the first place, a justification that hinges almost entirely on the sincerity of the plea for assistance. Here, that risk was never justified in response to the numerous 911 calls that resulted from Appellant's conspiratorial actions, and responsibility for those unjustified risks falls squarely at Appellant's feet. Additionally, by diverting resources from legitimate calls, Appellant risked harm to the community on numerous occasions by limiting the potential response capabilities of law enforcement. The fact that no specific harm resulted from those repeated diversions is a fortuitous result, not a result that speaks strongly to the non-dangerousness of Appellant's conduct. That law enforcement ostensibly did not require those

additional resources at the specific times when they received Appellant's false 911 calls is again merely a fortuitous result, whereas the risk of harm was still great. Therefore, we simply are not convinced by Appellant's argument that the trial court overstated his dangerousness in justifying its departure from the sentencing guidelines.

Moreover, it is clear that Appellant's dangerousness, or his dangerousness with regard to the risks created by the false 911 calls discussed above, was but one of many factors cited by the trial court. As is obvious from the court's reasoning above, it was particularly concerned with the frequency of Appellant's illegal conduct in furtherance of the conspiracy, as well as his defiance of the authority of the court by continuing that behavior even after he had been initially arrested. The court was also troubled that Appellant had enlisted both his wife and minor children in this criminal enterprise. These factors all speak to a great need to protect the public from Appellant not present in a typical case involving false 911 calls, despite Appellant's relatively unsubstantial prior criminal record. They also speak to a greater need for rehabilitation than may be present in the typical case.

As such, we conclude that the trial court acted reasonably when it sentenced Appellant outside the guidelines at count 2, even if, acting in the first instance, this Court may not have come to the same result. Accordingly, we ascertain no abuse of discretion and, therefore, Appellant's final claim lacks merit.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>7/1/2019</u>